Martin M. Frank, J.
The plaintiff in this action charges the defendants with an infringement of its rights, trade name and title to the word “ Eerie,” and with unfair competition.
All the parties involved are publishers. They are engaged, in addition to other forms of publication, in the business of publishing a comparatively new type of magazine. Called “ Comics ” or “ Comic Books,” the magazines are described as “ short stories told chiefly by illustrated sequences.” The sale of these periodicals has soared fantastically. It has been estimated that 80 million copies are sold every month through some 90,000 retail distributors.
By the immortals, literature has been called the highest form of human expression and the greatest of all sources of refined pleasure. The growth in contemporary literature of this new and malignant form, contrived as it is of lurid illustrations and language untouched by the essentials of grammar, good taste and careful vocabulary, makes a dreary prospect indeed for the art of American letters. What an unsavory dish to set before posterity.
In February, 1951, plaintiff began the printing and distribution of a comic book entitled Eerie, devoted to the field of weird, ghostly and horror stories. Six issues were distributed with a total circulation of over 300,000 for each of the first four issues. The total for the last two is not yet known.
The defendant Approved Comics, Inc., a wholly owned subsidiary of Ziff-Davis Publishing Company, which concedes joint responsibility, commenced publishing a quarterly comic magazine called Eerie Adventures. They have abandoned this title and replaced it with Eerie Mysteries. Both publications were nationally distributed by the American News Company.
When plaintiff learned of the publication of this magazine,, it communicated, first indirectly and later directly, with defendants, and requested cessation of publication of any periodical using the word Eerie. The defendants refused to comply.
This action followed. An injunction pendente lite was granted. Plaintiff claims the right to permanent injunctive relief because: First, there is an infringement on the title Eerie and on its good will and reputation; Second, that its use of the word Eerie has acquired a 1 ‘ secondary meaning ’ ’, which gives to plaintiff an exclusive right to such use; Third, there is imitation of the size, style, format, running heads, price and title of plaintiff’s maga *162 zinc, and that such simulation is likely to confuse the public into the belief that the two publications are one and the same.
The plaintiff’s predecessor Avon Comics Inc. obtained a certificate of registration for a magazine to be called Eerie Comics from the United States Register of Copyrights on January 10, 1947. Only one issue of that magazine was published and no part of the name was thereafter used by plaintiff until the first issue of Eerie in February, 1951.
If this were an action to enjoin an infringement of that copyright, a judgment for defendants would be decreed, for the courts of this State have no jurisdiction in an action to prevent infringement of a copyright. (Cohan v. Robbins Music Corp., 244 App. Div. 697; Field v. True Comics, 89 N. Y. S. 2d 35; Condon v. Associated Hosp. Serv., 287 N. Y. 411.)
The plaintiff urges the theory that it has acquired the exclusive common-law right to the use of the word Eerie as the catchword of its comic book title, as first user, and in any event that such use by it has established a secondary meaning which gives the plaintiff the right to such exclusive use.
With this conclusion we cannot agree.
The word “ eerie ” is an adjective of Scotch origin. The Oxford Dictionary defines it as “ fearful, timid, fear-inspiring, gloomy, strange, weird.” In modern usage it expresses a notion of a vague superstitious uneasiness. Its first known use was in “ Cursor Mundi ” in the 14th century. It appears in the works of Robert Burns, Charlotte Bronte and De Quincy. It thus is evident that the word is generic, of common usage and origin, with a semantic history for at least six centuries, and therefore in the public domain.
A name, generic in origin or descriptive of an article of trade or of its qualities or characteristics, cannot ordinarily be exclusively appropriated. (Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 547; Beacon Mags. v. Popular Pubs., 248 App. Div. 204; Buffalo Typewriter Exch. v. McGarl, 240 N. Y. 113; Manufacturing Co. v. Trainer, 101 U. S. 51; Kellogg Co. v. National Biscuit Co., 305 U. S. 111, 116; Warner & Co. v. Lilly & Co., 265 U. S. 526, 528.) Thus, for example, the Court of Appeals in Ball v. Broadway Bazaar (194 N. Y. 429) reversed an order restraining the use of the words “Lilliputian” and “Bazaar”.
The first use of a title does not, ipso facto, give to such user an exclusive right to an uncoined or nonfictitious name. Despite a persistent belief that the first use of a specific name or description gives a power to such user to prevent its employment by others, it is important to find that no such doctrine exists. *163 (Federal Tel. & Radio Corp. v. Federal Tel. Corp., 180 F. 2d 250, opinion by Learned Hand, Oh. J.; Brown & Bigelow v. Remembrance Adv. Prods., 27 Misc 2d 157, Wasservogel, Off. Ref., mod. 279 App. Div. 410.)
It is quite common to find magazines using names startlingly similar. There is Radio Digest, Radio World, Radio Age, Radio Progress, Radio News, Radio Broadcast; Motor, The Motor, Motor Transport, Motor Record, Motor World, Motor Age, Motor Life; Field and Stream, Forest and Stream; Popular Mechanics, Popular Science; to cite a few. In the field of comics, a cursory examination of newsstand displays discloses magazines with titles such as: Weird Science, Weird Worlds; Suspense, Suspense Detective; Man, Bat Man; The Thing, The Beyond; Web of Mystery, Journey into Mystery; First Love, Young Love.
To bring itself within one of the exceptions to the rule that words, generic or descriptive, may not be exclusively appropriated, the plaintiff urges that the name of its publication has acquired a secondary meaning.
The test by which secondary meaning is established is by satisfactory proof, that in the mind of the purchasing public there has been association between the product and its producer, sufficient to create public sanction for exclusive appropriation of the name. In this sense, the word becomes the trade-mark of the producer. (Gillette Safety Razor Co. v. Triangle Mechanical Labs. Corp., 4 F. Supp. 319, 322; Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665; Herring Safe Co. v. Hall’s Safe Co., 208 U. S. 554; Shredded Wheat Co. v. Humphrey Cornell Co., 250 F. 960; G. & C. Merriam Co. v. Saalfield, 198 F. 369, 373.)
The plaintiff has failed to establish either as a fact by a fair preponderance of the credible evidence or as a matter of law that its title has acquired a secondary meaning.
The use of a title which has acquired no secondary meaning and is descriptive of the publication is open to all. (Vogue Co. v. Brentano’s, 261 F. 420; Funk & Wagnalls Co. v. Timely Films, 3 F. 2d 93; Colleigate World Pub. Co. v. Du Pont Pub. Co., 14 F. 2d 158, affd. 25 F. 2d 1018; Warner Pub. v. Popular Pubs., 87 F. 2d 913; Beacon Mags. v. Popular Pubs., 248 App. Div. 204.)
Even where a secondary meaning has been acquired, a title can be freely used by others if additional words or differing combinations substantially distinguish it. (Time, Inc. v. Ultem Pubs., 96 F. 2d 164; Crowell Pub. Co. v. Italian Monthly Co., 28 F. 2d 613; Investor Pub. Co. of Mass. v. Dobinson, 82 F. 56; Commercial Advertiser Assn. v. Haynes, 26 App. Div. 279.)
*164 The remaining question to be determined is whether there is such imitation of size, style, format, running head and title of plaintiff’s magazine as to constitute unfair competition.
Public policy recognizes, approves and encourages competition. Free markets and competitive enterprise are accepted standards of our society. Restraint in competition is decreed when the element of unfairness is added. The action upon which it is based is tortious in nature and is a modern counterpart of the ancient action on the case. The application of restraints against unfair competition rests upon equitable principles. Equity intervenes to enforce fair play in business competition. It seeks to prevent unfair and unconscionable advantages taken by one against his competitor. (Philadelphia Stor. Battery Co. v. Mindlin, 163 Misc. 52; 1 Callmann, Unfair Competition and Trade-Marks [2d ed.], pp. 72-75, 133-135 and cases cited.)
Unfair competition was originally applied to the palming off of one’s goods as those of a rival trader. This limited view has been extended and broadened in recent years to include a misappropriation of what equitably belongs to a competitor. (Schechter Corp. v. United States, 295 U. S. 495, 531, 532; International News Serv. v. Associated Press, 248 U. S. 215.) In the International News Serv. case (supra, pp. 241-242), Mr. Justice Pitney, speaking for the majority, said: “It is said that the elements of unfair ¡competition are lacking because there is no attempt by defendant to palm off its goods as those of the complainant, characteristic of the most familiar, if not the most typical, cases of unfair competition. * * * But we cannot concede that the right to equitable relief is confined to that class of cases.”
It has been said that the law relating to unfair competition has a manifold purpose, which includes the shielding of the honest trader in the business which fairly belongs to him; the punishment of the trader who takes his competitor’s business away by unfair means, the protection of the public from deception. (Gulden v. Chance, 182 F. 303.)
It must be held upon all of the credible evidence, that plaintiff has failed to prove, by a fair preponderance of the evidence, that defendants intentionally and willfully sought to pass off their magazine as that of the plaintiff. No proof was offered that any reader or prospective customer was misled or deceived.
In suits to enjoin unfair competition, it is not necessary to prove that the defendant intended to pass off his product as that of the plaintiff. If his actions accomplish that result, good intention or honesty of purpose is not a defense. Many tests may be applied to determine what is calculated to deceive or *165 what the commercial effect will be, but the all sufficient one is whether, in the light of experience, there has been actual deception or confusion. The restraints which may fully protect distributors may be wholly inadequate to safeguard the inexperienced public. (Photoplay Pub. Co. v. La Verne Pub. Co., 269 F. 730; Dutton & Co. v. Cupples, 117 App. Div. 172.)
It is not essential to prove actual confusion, deception or bad faith when the use of the name is calculated to mislead unwary purchasers. (Golenpaul v. Lowenstein & Sons, N. Y. L. J., June 25,1940, p. 2868, col. 2; Famous Sea Food House v. Skouras, 272 App. Div. 258, 260.)
It appears that each of the parties uses a distinctive colophon, which is a comparatively small emblem or imprint on the cover of the publication.
It is found that the colophon serves to aid the common distributor to distinguish the periodical of one publisher from those issued by others. It is further found that no evidence was offered, sufficient to warrant the conclusion that the purchasing public made any such distinction from the use or appearance of a colophon.
The defendants offered proof of the sale and distribution of approximately 3,000 display racks for the segregation of their products including Eerie Mysteries. They urge that this testimony establishes a lack of intent to confuse or deceive and that by segregation of publications there could be no unfair competition. It must be found that the number of racks distributed is insignificant in comparison to the number of retail outlets, nor does it remove the likelihood of confusion on the part of the ultimate purchaser, assuming that each retailer had such a display rack. There was no proof that these racks were used by the storekeeper in the manner requested by the defendants.
The size, style, format, running head and title of the magazine in question, each considered alone would not establish unfair competition. From plaintiff’s witnesses it was established that all the publications in this group are of a similar size, contain 32 pages, sell for 10 cents, generally carry a running head, have a colored title page, and feature a supernatural or unnatural body and a terrified female.
It is the combination of all of these components which creates the vice. If the entire cover is likely to confuse or mislead the ultimate purchaser, then it is within the province of equity to interfere. (Pocket Books v. Meyers, 265 App. Div. 17.) While the defendants have the right to use the word “ eerie ” in the title of their magazine, they must do so in such manner as will, sufficiently distinguish it from plaintiff’s, to avoid confusion *166 and thus prevent a deception upon the purchasing public. (Fawcett Pubs. v. Popular Mechanics Co., 80 F. 2d 194, 199.)
Considering the market for which these magazines are designed, published and purveyed, it must be found that the composition of the cover of defendants’ comic book would tend to confuse and mislead the reader desiring to purchase plaintiff’s periodical. The defendants must' be found guilty of unfair competition. (Beacon Mags. v. Popular Pubs., 248 App. Div. 204, supra.)
It is found that the plaintiff has been damaged in an amount not ascertainable at the time of the trial.
This constitutes the decision of the court pursuant to section 440 of the Civil Practice Act.
An interlocutory decree will issue enjoining the defendants from publishing Eerie Mysteries with its cover in its present form. A proposed cover may be submitted for approval with the word “ Eerie ” reduced in size, the word “ Mysteries ” enlarged and such other changes as the parties may be advised to adopt in order to conform to the decision.
The proposed decree shall also provide for the appointment of a Referee to take proof, ascertain and determine the damages sustained by the plaintiff. Submit proposed interlocutory judgment on notice.