ESQUIRE, Inc.,
v.
ESQUIRE SLIPPER MANUFACTURING CO., Inc.
Civ. A. No. 54-224.

United States District Court
D. Massachusetts.

March 16, 1956.

As Modified June 27, 1956.

---

Hale & Dorr, James D. St. Clair, Boston, Mass., for plaintiff.

Cedric W. Porter, Boston, Mass., for defendant.

ALDRICH, District Judge.

This is an action primarily for an injunction brought by Esquire, Inc. against Esquire Slipper Manufacturing Co., Inc. Jurisdiction exists both under the Lanham Act, 15 U.S.C.A. § 1051 et seq., and on the basis of diversity. Plaintiff, since 1933, has published a magazine under the name of Esquire, U. S. Trademark No. 313,768, printed in a distinctive, disjointed script. The defendant manufactures men's slippers, ten per cent of which it sells under the name Esquire, and the balance under various names selected by individual chain and department stores. It does not sell at retail. The plaintiff objects to defendant's using the name Esquire on any slippers; it objects to the name Esquire being reproduced by the defendant in script, as distinguished from block letters (which the defendant does frequently, but not uniformly); but, fundamentally, it objects to the defendant's employing the name Esquire in any connection whatever. The defendant has offered, unacceptably, to stipulate that it will not hereafter use the name on merchandise, or in any sales or promotion, and will use it only as part of its corporate name, and then in block letters. Accordingly, I will take this final reservation of the corporate name, which it is unwilling to renounce, as the first issue.

Plaintiff's magazine has a very considerable national circulation. It is comparatively high priced, is addressed primarily to a relatively well-to-do audience, and commands substantial advertising, both in lineage and revenue. It purports to be concerned with all "masculine interests," and to an extent it may be, although I cannot avoid the thought that one is disproportionately emphasized. Other prominent features are men's wear, liquor and travel. In advertising lineage those three items rank in the order named. In non-advertising content ("editorial," so-called), men's fashions would appear to maintain the same relation to the other two, but to stand far behind fiction, non-fiction, cartoons, and other pictorial. I disagree with defendant's contention that such subordination is of importance.

While plaintiff asserts that it has substantial "acceptance" as to liquor and travel, and doubtless has, or it could not maintain its advertising volume, in the area of men's fashions it goes further and claims a virtual monopoly. The suggestion was that if plaintiff said such and such would be the fashion, it was;

and if plaintiff said it was out, it was out. Only when I heard defendant's case I learned that national manufacturers spent four times as much to advertise men's wear in Life magazine as in the plaintiff's. The counter fact that this bought fewer pages, and that fewer advertisers in number could afford Life's far higher rates, scarcely means, under these circumstances, that the plaintiff is "almost the sole arbiter of what is correctly fashionable." For this, and other reasons, I will not so find. On the other hand I do find that the plaintiff's name, so far as it belongs to the plaintiff, has valuable good will, and is regarded as a prominent voice on the subject of men's fashion.

I do not find that the plaintiff in any material degree "creates" fashions. However, it is industrious in discovering, analyzing and promoting incipient trends, and no doubt in many cases its presaging them accelerates or accentuates their development.[1] Beyond this I cannot go. However, that is enough so that persons wishing to be in the forefront on styles often turn to the magazine and follow its "editorial" suggestions in making their purchases. A concomitant, stimulated by the fact that the plaintiff informs advertisers in advance by previews, including a separate magazine entitled "Apparel Arts," what its editorial features are to be, enabling them to advertise currently and consistently therewith, is that plaintiff's readers are contemporaneously exposed to advertising copy to which the editorial content has made them especially receptive.

Plaintiff offers its advertisers a further service, known in the trade as tie-ins. It prepares placards and other mechanical devices for its advertising customers, permitting them to inform buyers at the retail level that their goods are "As advertised in Esquire," or are "An authentic Esquire fashion." There was expert testimony, and I find, that this tends to give the retail consumer the impression that the plaintiff endorses the product. In other words, plaintiff sells not only advertising, and the normal benefits that flow therefrom, but sells also what it calls a "commercial blessing," or a portion of the fashion prestige which attaches to its name.

While there was some suggestion that plaintiff maintains a board of censorship, and that, for instance, it would not permit the advertising of "zoot suits," the plaintiff did little to satisfy me of activity in this direction.[2] However, I do not believe this issue material to the present decision.

I turn to a more fundamental controversy. Plaintiff's witnesses testified, with some positiveness, that the word "Esquire" meant only one thing—Esquire magazine.[3] Though admitting that there was a dictionary meaning, along the lines of gentleman, or country squire, its testimony was that this meaning is as outdated as the country squire himself. Defendant's contention, on the other hand, is that the term is a general one, signifying gentleman, honor, title, or respect. As a lawyer trained in the propriety of addressing letters to other lawyers as ——— ——— Esq.,[4] I have an initial reluctance to conclude that

1. Plaintiff freely admits that one of its principal purposes is to "encourage the change in men's fashions for the purpose of creating obsolescence." Cf. "The fashion wears out more apparel than the man." Much Ado About Nothing, III, iii.

2. Plaintiff's testimony that it would not advertise "zoot suits" is to be compared with its "tie-in" exhibit for Belmont's "cone" style, which, though I am far from a fashion expert, would appear

particularly designed for a "zootsuiter" who had come into a little money.

3. Cf. Plaintiff's trial brief, "To the public the word Esquire signifies and refers to plaintiff and plaintiff alone."

4. See, e. g., De La Paz v. Coastal Petroleum Transport Co., D.C.S.D.N.Y., 136 F.Supp. 928, 929; Mulcahy & Dean, Inc. v. Hanley, 332 Mass. 232, 124 N.E.2d 261; Mencken, The American Language, 278 (4th ed. 1938).

the word in the sense advanced by the defendant has disappeared from the language. Nor can I help but observe that when the plaintiff was not testifying in court it attached the word "Esquire" to the name of a fashionable and fortunately situated gentleman owner of an "aristocrat" yacht.[5] Far from saying that the word has become archaic (or that it refers to plaintiff's magazine), Webster's New International Dictionary (2d ed. 1954) expressly states that its use "is common," although its meaning is unprecise.

Apart from socially, on plaintiff's admission, some 5,000 persons throughout the country have adopted the name Esquire commercially. So far as I know plaintiff does not claim a monopoly in any area except men's fashions, and certainly its prestige in such fields as automobile service stations, barber shops, cafes, cleaners, florists, and foods, to select a few at the beginning of the alphabet, can scarcely be significant, as it carries no advertising in those categories. The record indicates that "Esquire" has been attached to hundreds of such services or goods that have no connection with plaintiff or any of its allied activities, except a similarity of name. Even before plaintiff's trademark was obtained, the name was registered for men's furnishings, pipes, toilet articles, watches and writing paper. Such disparate uses may have grown, but for the plaintiff to claim full parentage seems little short of preposterous.[6] While very possibly some do, I am unable to believe that a substantial number of these users have any thought of, or possibility of, any free-loading on the plaintiff. On the contrary, their use of the name is substantial evidence of the fact that in the public mind Esquire is not limited, either to men's fashions or to plaintiff's magazine, but has the connotations for which defendant contends. I accept defendant's and reject plaintiff's contentions.

This brings me to a further consideration. The plaintiff has adopted a comprehensive program of "policing" the name Esquire, so as to discourage its use by all and sundry. This undertaking is not limited to fields in which there could be thought to be any trademark violation, unfair competition, or "free-riding," but is on the bold, and I hold legally untenable, basis that everyone who uses commercially the word Esquire, or even any of its derivatives, such as Squire or Squires,[6½] is unlawfully appropriating what is plaintiff's, and plaintiff's alone. The method, if plaintiff's correspondence with the defendant is an example,[7] is to begin with letters suggesting that the addressee's "unfair trading" may have been inadvertent, or if not, that plaintiff would like to overlook that aspect, followed up by more letters indicating plaintiff's growing concern that it will have to bring court action, but at the same time suggesting an "amicable disposition," which latter, on analysis, means that the addressee will do everything the plaintiff wants. Plaintiff even throws in the suggestion that resistance to its demands is short-sighted, if not anti-social, because whatever plaintiff wants is good for industry, and

---

5. Esquire, March, 1954, pp. 42–3. A casual search indicates that this gentleman did not come into the title by grace of being a member of the bar.

6. Esquire's use was "common" in 1934, the year after plaintiff's magazine was launched. Webster's International Dictionary (2d ed. 1934).

6½. For example, plaintiff's position is that Squire's Home for Aged and Convalescent, Squire Market and Squire Realty Co. are, (or were) trespassing on its sole property.

7. There was no evidence that plaintiff pursued this method or any part of it, with relation to some fifteen hundred other users of the name Esquire and companion names on its correspondence "Index," but I think it is a fair inference, from the fact that eleven hundred of them gave up, that in many instances this was done following threats of suit, and not just out of courtesy to oblige the plaintiff

hence even for the addressee. Court action is seldom brought. I asked the plaintiff why it did not bring more suits, and it replied that it could not afford to. I would be more disposed to think that it does not want to.

Plaintiff's campaign, and I use the term advisedly, appears to be the pincer movement so well known to students of World War II. On the one hand its attorneys correspond with remote parties of the types above listed, who capitulate in large numbers.[8] On the other hand it sues a comparatively small and select group against whom it does have some color of claim. The decrees that it is successful in obtaining, mostly, again, by consent, it undoubtedly uses to reinforce its attack against the remote infringers. Conversely, and this is the interesting point that puzzled me at first, it benefits from the reduction in the ranks of these latter by limiting the arguments that parties like the defendant, who are in more vulnerable positions, could otherwise make by pointing to a wider use of the name.[9]

I find on all of the evidence that the term Esquire, while associated in the minds of a not inconsiderable portion of the public with the plaintiff's magazine, with the subsidiary consequences aforementioned, is also associated or understood by the public in a general sense of dignity or quality quite unconnected with plaintiff's magazine. I further find, if material, that plaintiff is engaged in a wholesale attempt to prevent the use of the name Esquire by persons against whom is has no possible rights. I do not deem it necessary to conclude whether in many instances this is done by threats of legal proceedings which plaintiff has no real intention of bringing, and which it knows would not be successful.

■■ I turn now to the specific issue of whether the defendant can be prevented from using Esquire, in block letter form, in its corporate name. The cases upon which plaintiff principally relies, such as Esquire, Inc., v. Maira, D.C. M.D.Pa., 101 F.Supp. 398, are confusion cases, which involve conduct by the defendants that was found to afford them a free ride on plaintiff's reputation. Where such a finding is warranted the law presumes injury to reputation, as Judge Wyzanski pointed out in Food Fair Stores v. Food Fair, D.C.D.Mass., 83 F.Supp. 445, affirmed, 1 Cir., 177 F.2d 177, without proof that defendant has "cheapened" it by association with an inferior product.[10] There may also be an injury which some courts, and the Massachusetts statute,[11] term dilution. While dilution has been described as the

---

8. The statement in plaintiff's brief that these 1,110 desisting users "would not have discontinued unless they knew Esquire was in the right" overtaxes my credulity. There are many other inferences. Compare plaintiff's testimony that even it, with an annual income of over $4,000,000, cannot afford to bring the suits that it would like to, and that it abandoned one action because the defendant therein filed so many interrogatories. This I'm-100%-right, the other-fellow-is-100%-wrong, concept is typical of plaintiff's attitude throughout.

9. Note plaintiff's testimony that the word Esquire "is such a little used word, as a word," that defendant's dictionary meaning is unwarranted. This is not true, but obviously if plaintiff could induce all such broad and general users to desist, there would be more semblance to its position.

10. It has been said that the doctrine of the free ride has been "discredited." Frank, J., dissenting, in Triangle Publications v. Rohrlich, 2 Cir., 167 F.2d 969, 978. I believe the most that this statement means is that there may be free rides which the law will disregard. Thus, even if it could be said that the plaintiff's use of Esquire had tended to increase public use or acceptance, and enhance the already common meaning of the word, this would not be the basis of a claim. To the same extent every national advertiser of an unpatented article increases public demand for the product, which may work to the benefit of competitors.

11. I agree with the finding in the Food Fair case that the Massachusetts "anti-dilution" statute, Mass.G.L. (Ter.Ed.) Ch. 110, § 7A, was enacted to bring the Massachusetts law of unfair competition

whittling away of a special meaning through use by another, this is too broad a definition. I believe there must be at least some "likely confusion,"[12] and that where there is none, a person proceeding on the strength of his own title is not guilty of dilution. Manufactured words may have a special individual meaning, and so may a combination of common words.[13] But I will not hold that a single or solitary word in common use can be entirely appropriated from the public domain so that other users have no right.[14]

■ The plaintiff, accordingly, must show at least a recognizable possibility of confusion. So far as the defendant's corporate name is concerned, where it sells a product to stores or wholesalers, under names chosen by the buyers, I see no such possibility even though confusion be widely interpreted to include approval, endorsement, or merely having been advertised in plaintiff's magazine. Such purchasers would not be misled.[15] This disposes both of the Lanham Act and all aspects of the claim for unfair competition. I do not reach defendant's point that plaintiff should be barred from injunctive relief by reason of abuse of other users.

■ Plaintiff fears that if the defendant is permitted to retain its corporate name it may later expand its activities and engage in improper conduct. If and when that occasion arises will be the appropriate time to consider it. Food Fair Stores v. Food Fair, 1 Cir., 177 F.2d 177. If I were to accept plaintiff's argument, there would be no limit to where it would lead.

The further question of whether defendant should use the name Esquire on slippers at the retail level, because it involves men's wear and fashions, and may involve confusion, is more difficult. Defendant has testified, however, that its right to do this, if it has that right, unlike its right to continue a corporate name by which it is well known, is of no value to it. I do not propose to pass on this question just for mental exercise. I therefore suggest that the defendant make arrangements to discontinue with reasonable promptness the use of the name Esquire on all merchandise, etc., and to discontinue its use in script form in connection with its corporate name. The defendant will not be ordered to discontinue the use of its full present corporate name in block form upon merchandise, labels, containers, or advertising material, provided the word Esquire shall be in identical type with, and no more conspicuous than, the rest of the corporate name, and provided also that if merchandise is so sold it shall bear, at least equally prominently, some trade or semi-descriptive name which has no connection with Esquire.

■ On the matter of counsel fees and expenses, both parties have asked for allowances. At the conclusion of plaintiff's case defendant offered to do essentially all of the things recited in the preceding paragraph. The plaintiff evidenced no interest in this offer, but continued the trial with full vigor in its remaining aspect or aspects. On the present posture my discretion is not moved to award plaintiff counsel fees. Neither will I award any to defendant, however I might have felt, had its offer been made before the trial.

---

into line with some of the federal decisions. I do not believe that it was intended to go any further, or there would be no logical boundaries.

12. G. B. Kent & Sons, Ltd. v. P. Lorillard Co., D.C.S.D.N.Y., 114 F.Supp. 621, 631, affirmed, 2 Cir., 210 F.2d 953.

13. Sunbeam Lighting Co. v. Sunbeam Corp., 9 Cir., 183 F.2d 969, certiorari denied 340 U.S. 920, 71 S.Ct. 357, 95 L. Ed. 665.

14. Sunbeam Furniture Corp. v. Sunbeam Corp., 9 Cir., 191 F.2d 141, rehearing denied, 9 Cir., 191 F.2d 731; Arrow Distilleries v. Globe Brewing Co., 4 Cir., 117 F.2d 347.

15. The distinction between buyers was adverted to in Sunbeam Lighting Co. v. Sunbeam Corp., supra, note 13, and between the product name and the corporate name in Sunbeam Furniture Corp. v. Sunbeam Corp., supra, note 14.