The GEO. WASHINGTON MINT, INC., a New York corporation, Plaintiff,

v.

The WASHINGTON MINT, INC., an Ohio corporation, Defendant.

No. 72 Civ. 2308.

United States District Court, S. D. New York.

Oct. 12, 1972.

York and Ohio. The defendant is a corporation chartered in Ohio. The plaintiff is a New York corporation. Diversity of citizenship exists and the requisite jurisdictional amount is alleged, and is apparently reasonable in light of the "good will" seeking protection. Jurisdiction exists under 15 U.S.C. § 1125(a) (Section 43(a) of the Lanham Act) and 28 U.S.C. §§ 1338(a) and 1338(b), as well as 28 U.S.C. § 1332.

An evidentiary hearing was held on June 23, 1972.

Rosenman, Colin, Kaye, Petschek, Freund & Emil, New York City, for plaintiff by Schrader, Harrison, Segal & Lewis, William M. Barnes, Robert S. Bramson, Philadelphia, Pa., of counsel.

Royall, Koegel & Wells, New York City, for defendant by David F. Dobbins, Thomas C. Morrisson, New York City, of counsel.

GURFEIN, District Judge.

The plaintiff which uses the trademark "The Geo. Washington Mint" moves to enjoin, pendente lite, the defendant which uses the trademark "The Washington Mint." The defendant also uses as its mint mark on the reverse side of its products, in conjunction with "The Washington Mint," a representation of the Washington Monument and a profile of George Washington. Both claim use in interstate commerce. Each claims prior use. Neither party has registered its mark under the Lanham Act, 15 U.S.C. § 1051 et seq., although the plaintiff has applied for registration. The plaintiff has registered its mark in several states including New

## FINDINGS OF FACT *

1. The plaintiff was incorporated under the laws of New York on January 10, 1972 under the name The Geo. Washington Mint, Inc. John Gooding, the President of The Geo. Washington Mint and owner of approximately 15% of its stock, testified at the hearing.

2. The defendant, The Washington Mint, is an Ohio organization incorporated on April 8, 1971. William Richardson is the President of The Washington Mint and testified on behalf of the defendant.

3. The Washington Mint is the successor of a corporation known as Richardson Limited, Inc. which had been formed by Mr. Richardson in September 1970.

4. All three corporations have engaged in commercial activities involving commemorative products made primarily of sterling silver.

5. Richardson Limited, Inc. manufactured commemorative medals, particularly sterling silver ingots, for sale to distributors who resold the medals under their own names. Richardson Limited, Inc. continued these activities until early 1972, when that company was phased out in favor of The Washington Mint.

6. There are no sales records for 1971 revealing any sales of medals under the defendant's own mint mark. Accordingly, the earliest date that goods were

---

* These findings of fact are somewhat amplified in the opinion and such additions shall be deemed included for the purposes of Fed.R.Civ.P. 52(a).

shipped with this mint mark in interstate commerce was about March 1, 1972.

7. The March and April invoices reveal that the shipments made during those months were made intrastate in Ohio to one Hy. Brown. These ingots and medals were then resold by Brown in interstate commerce. That shipment qualifies as interstate commerce but there is no specific proof of when Brown first shipped the goods in interstate commerce.

8. Earlier, in the Summer of 1971, The Washington Mint did make substantial outlays for capital investments, including the leasing of automatic coining presses from an English corporation costing $159,076.

9. Recently The Washington Mint has begun a publicity campaign, with advertisements appearing in the West Coast edition of The Wall Street Journal in May 1972 and in Coin Age in July 1972. Until then the defendant had limited its advertising to the Cleveland telephone directory under "Coin Cards."

10. During the first five months of 1972 the defendant sold only about $9,000 worth of goods under the name "The Washington Mint." Mr. Richardson testified that most of the remaining $32,000 sold thus far in 1972 has been to the Kennedy Mint which resold the items under its own name.

11. The Washington Mint currently manufactures and distributes a variety of symbolic numismatic medals, ingots and plates. Each has a profile of Lincoln, Eisenhower, Washington, an American Indian or a buffalo. The ingots are relatively small (2″ by 1″) and cost $2.60 each. The coins are 1½″ in diameter and sell for $2.50. A set of ingots and coins, called Symbolic American Numismatic Series, is available for $39.-95.

12. Together with the series of silver ingots and medals introduced at the hearing (Deft. Ex. A) the company manufactures forty different types of items.

13. It was not until April 1972, that the defendant entered into the manufacture of sterling silver commemorative plates. From May 1972 to June 16, 1972, the company has sold in interstate commerce 24 plates depicting The Last Supper at $62.50 each. In addition there have been 10 plates sold in Ohio.

14. Although there was no evidence that the defendant has sold or manufactured any commemorative plates other than those portraying The Last Supper, Mr. Richardson indicated that it was the company's intention to expand its production in this field of silver work.

15. On the back of each item manufactured by the defendant there appears an inscription THE WASHINGTON MINT and a profile of George Washington with a silhouette of the Washington Monument. Between the lettering and the profile is a "w" imposed on the top of an "m."

16. The plaintiff, The Geo. Washington Mint, distributes commemorative plates exclusively. It does not engage in the production of numismatics in general nor has it expressed any intention of doing so.

17. All the plaintiff's products are manufactured by Medallic Arts with whom the plaintiff now deals exclusively.

18. The Geo. Washington Mint, however, plays a major role in the production of the plates, in the development and concept of the program, the selection of the artists involved and the selection of the sculptors to do the artists' work. It provides to the manufacturing facility a finished plaster from which they make the dies and provide the work. It is the entire distribution and marketing end of the work.

19. In April 1972 Medallic Arts entered a "mutual exclusive contract" with the plaintiff whereby Medallic may not manufacture a similar product for another customer and the plaintiff may not manufacture anything itself unless Medallic is incapable of making it.

20. The plaintiff carries the name "The Geo. Washington Mint/The Private Mint" on the back of each of its products and uses that phrase in its advertisements.

21. Other companies also call themselves Mints although they do not actually manufacture their own products, such as the Danbury Mint and the Kennedy Mint.

22. Thus far the plaintiff's distribution has been limited to two 10,000 editions of eight-inch plates, one portraying "Whistler's Mother" produced as a Mother's Day gift, the other bearing N. C. Wyeth's "The Arsenal of Democracy," distributed to commemorate the Fourth of July.

23. The retail value of the plates that have been shipped to dealers totals approximately $2 million.

24. The plates are struck silver and cost $150 each. A few plates in each line are sterling proof, retailing for $1,000 and some are 18 carat solid gold retailing for $2,000 each.

25. The Geo. Washington Mint is currently engaged in the production of a new plate authorized and created by Pablo Picasso on an exclusive five year contract. Another project is a series of plates done in combination of bronze and silver by William Sawyer and with the endorsement of the Whitney Museum, a series of plates by Frederick Remington. The plaintiff has invested approximately $500,000 in these productions.

26. In early December 1971 the plaintiff launched a blunderbuss promotional campaign. On December 13, 1971, Silver Creations, Limited, a sales organization, was engaged to sell the plaintiff's products. Through Silver Creations' efforts the first orders for the Wyeth plates were received on December 22, 1971.

27. At that time the plaintiff was not yet incorporated and possessed only 20 plates which were used exclusively for solicitation purposes.

28. By January 31, 1972 The Geo. Washington Mint had received orders for approximately 18,000 Wyeth plates and 14,000 Whistler plates from 192 dealers. The orders were placed directly with the plaintiff, The Geo. Washington Mint; Silver Creations acted merely as a solicitor.

29. Interstate shipment of the plates began on March 29, 1972, with a shipment to a customer in Northern New Jersey. Mr. Gooding testified that the delay in filling orders was the result of a strike by United Parcel Service employees. Thereafter, commencing in the first week of April 1972, the plaintiff's plates were shipped to 46 states and Canada.

30. In April the plaintiff terminated its relationship with Silver Creations, assuming the distribution of its own products.

31. Despite the fact that these orders had surpassed the limited supply of each 10,000 plate edition, The Geo. Washington Mint has refrained from selling approximately 800 Whistler plates and 400 Wyeth plates and has continued the publicity campaign.

32. Between January and April The Geo. Washington Mint has been able to increase the number of dealer accounts by 115 through mailings, telephone calls and personal visits. Presently the plaintiff has 315 dealer customers.

33. The plaintiff has now arranged for its dealers to have an advertising allowance of up to 10% of total payments by dealers to the plaintiff. In addition the plaintiff has supplied dealers with promotional packages, including mats for reproducing the Wyeth and Whistler plates, in order to facilitate dealer advertising.

34. As of June 23, 1972 the plaintiff had incurred commitments to reimburse dealers in the sum of $150,000 for their advertising. Approximately an additional $150,000 has been expended on other promotional activities, including a dealer conference in Denver, promotional material and mailing costs.

35. Since February 1972, advertising has appeared in such nationally circulat-

ed publications as The Antique Trader, Coin Age, Coin World, The Wall Street Journal, The New York Times, including the Sunday edition, The New Yorker, The National Observer, The Antiquity, Collectors News and Town & Country; and such regional periodicals as San Francisco Chronicle Examiner, Record of Bergen County (New Jersey), Houston Chronicle, The Denver Post, Stockton (California) Record, Philadelphia Jewish Exponent, Seattle Daily Times, St. Louis Globe-Democrat, Ridgewood (N.J.) Herald News, Atlantic City Press, Buffalo Evening News, Commercial Appeal (Memphis, Tennessee), and Omaha World Herald.

36. In many instances, the advertisements by dealers have referred to the plaintiff in shorthand, often using "G. Washington Mint," "Washington Mint" and "The Washington Mint." The plaintiff has since issued a dealer confidential bulletin urging that care be taken to refer to the company as The George Washington Mint or The Geo. Washington Mint/The Private Mint.

37. Mr. Gooding testified that while there had been several inquiries from dealers about the possible relation between The Washington Mint and The Geo. Washington Mint, he has "no knowledge of anybody who has ever bought anything from The Washington Mint in Ohio" believing the source was The Geo. Washington Mint.

38. At the hearing Mr. Gooding explained the rationale for this massive advertising campaign which came in the wake of the flood of dealer orders as necessary to enhance the company's good will in light of its future projects and "to reinforce [the] sales [of the Wyeth and Whistler plates] to [the dealers'] ultimate customers."

## OPINION

■ I find that the plaintiff has a claim to a slight priority of actual use in interstate commerce. The prior incorporation of the defendant, in itself, does not establish priority of trademark use. See Lawyers Title Ins. Co. v. Lawyers Title Ins. Corporation, 71 App.D.C. 120, 109 F.2d 35 (1939), cert. denied, 309 U.S. 684, 60 S.Ct. 806, 84 L.Ed. 1028 (1940).

■ The plaintiff has established that its first use of the trademark on its goods was on March 29, 1972. Its first use of "The Geo. Washington Mint" in both interstate and intrastate commerce was on December 20, 1971. The initial sales effort began in September 1971. Two hundred plates were ordered from the plaintiff through its sales agent on December 22, 1971. At that time the plaintiff had twenty sample plates on hand which it used for display purposes. By January 31, 1972 the plaintiff had received orders for approximately 18,000 Whistler plates and orders for 14,000 Wyeth plates. The orders came from 192 dealers.

All this makes out a use by the plaintiff of its mark for the purpose of determining priority. 3 Callman, Unfair Competition, § 76.1 (3d ed. 1968). Actual sale is not necessary. New England Duplicating Co. Inc. v. Mendes, 190 F.2d 415, 417 (1 Cir. 1951); 3 Callman, supra § 76.2(d) at 288. Here the taking of orders made contracts of sale and the use of "The Geo. Washington Mint" was an integral part of the process of sale. Using a word for publicity although only a single demonstrator had yet been built has been found by the Commissioner of Patents to establish priority. Duramold Aircraft Corp. v. Timin Aircraft Corp., 62 U.S.P.Q. 387 (1944).

■ The defendant, on the other hand, offered no proof that it did any solicitation in 1971. Mr. Richardson's testimony of sales in that year was later retracted as mistaken. The only activity consisted of sales to dealers who sold to the public not under the name of The Washington Mint but under their own name. The defendant's purchase of a coining machine is preparation rather than use. The first actual use of the name was on March 1, 1972 when an intrastate shipment was made to a dealer in Ohio named Hy Brown who is said to have reshipped them promptly though no

evidence was tendered in support of that claim. I will assume, *arguendo*, that an intrastate shipment may constitute a prior use on a non-registered mark, as distinguished from the use in commerce required under the Lanham Act. See R. J. Maran Co. v. Gordon, 101 U.S.P.Q. 206 (1954), citing Macaulay v. Malt-Diastase Co., 55 App.D.C. 277, 4 F.2d 944 (1925). But there is still a space of more than two months between the plaintiff's cognizable use and the defendant's. It was at least three months later that the defendant began to make commemorative silver plates under "The Washington Mint." That is enough to make the plaintiff a prior user, J & K Sales Co. v. Gemex, Inc., 166 F.2d 569, 570 (1 Cir. 1948); Ritz Cycle Car Co. v. Driggs-Seabury Ordnance Corp., 237 F. 125, 128 (S.D.N.Y.1916) since its use thereafter has been continuous and substantial.

This priority of the plaintiff is enough to avoid the dilemma implicit in a precisely even start, if it is found that the plaintiff has a good trademark. See United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 100, 39 S.Ct. 48, 63 L. Ed. 141 (1918); Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 700 (2 Cir. 1961); 2 Nims, Unfair Competition & Trademarks, § 346, p. 1078 (4th ed. 1947); Restatement of Torts, § 717, comment f.

■ While the defendant is technically a junior user he is an innocent junior user so far as intent to infringe the plaintiff's mark is concerned, see Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607 (2 Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960), since his preparations for the use of "The Washington Mint" occurred before "The Geo. Washington Mint" was even a glint in the plaintiff's eye. But the defendant's innocence does not resolve the question whether the plaintiff is, nevertheless, likely to succeed on any of its claims. Best & Co. v. Miller, 167 F.2d 374, 377 (2 Cir.), cert. denied, 335 U.S. 818, 69 S.Ct. 39, 93 L.Ed. 373 (1948). There remains also the question whether denial of interim relief would cause it irreparable injury.

■■ The validity of either claimed common law trademark is not easily determined.[1] George Washington, so far as the plaintiff's mark is concerned, clearly refers to the First President of the United States. It is a name that is *publici juris.* Anyone may appropriate it for it is in the public domain. "Geo. Washington Mint" is not a technical trademark in the sense that it is a coined phrase. But it does involve a use which is not descriptive or geographical. Nor is it likely to be associated in the public mind with the surname of a living person, although there are undoubtedly such persons in existence. The historical figure has no particular relationship to silverplates or to any nostalgic memory of the American people related to silver. Nor would anyone think that George Washington was the manufacturer. See Lucien Piccard Watch Corp. v. Crescent Corporation, 314 F.Supp. 329, 331 (S.D.N.Y.1970); Restatement of Torts 2d § 722 (Tentative Draft No. 8).[2]

1. I am mindful of the well-known language in Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U.S. 118, 137, 25 S.Ct. 609, 613, 49 L.Ed. 972 (1905): "The principle that one corporation is not entitled to restrain another from using in its corporate title a name to which others have a common right, is sustained by the discussion in Columbia Mill Co. v. Alcorn, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144, and is, we think, necessarily applicable to all names *publici juris.*" In more modern law, as we note, the name in the public domain, properly used, can be exclusive. See Note 2.

2. "Names of noted persons may be trademarks without acquiring secondary meaning. Whether a personal name * * * may be a trademark without a showing of secondary meaning rests upon two facts: First, the requirement of fame; and second, the requirement that its use is not likely to mislead purchasers into commercially associating the goods or services with another person who has the same name." Restatement of Torts 2d § 722 p. 89 (Tentative Draft No. 8).

In that sense, then, the use of George Washington, as applied to a trademark for commemorative silver plates, is arbitrary and nondescriptive.[3] Such a mark deserves protection from the first faltering steps it takes in interstate commerce. Restatement of Torts 2d § 722 (Tentative Draft No. 8), except where there is an antecedent good faith use in a particular locality. United Drug Co. v. Theodore Rectanus Co., *supra.*

■ The defendant's adopted mark which seeks common law acceptance is "The Washington Mint"—that is, "Washington" without the "George." The use of these words as a trademark for silver objects may prove to be deceptive to potential customers. At first blush—and buyers are not likely to ruminate on their first impressions—it looks as if the goods to which such a mark is affixed came from the Government Mint in the City of Washington. It seems to me that "Washington" combined with "Mint" more likely would be taken as a reference to the City named after the First President rather than to the President himself. If that were the only connotation it might not be objectionable because the defendant makes its wares in Ohio not Washington, and it would not be usurping a geographical region for its own as indicating exclusive source.[4] On reflection, I think the combination "The Washington Mint," is too slick to pass as a legitimate trademark. Whether intended by the defendant or not, there is reason to believe that a retail buyer would be misled into thinking that the goods were made by the Government Mint.

It is just such a possibility with which Section 43(a) of the Lanham Act deals. That section, in pertinent part, reads: "Any person who shall affix . . . or use in connection with any goods . . . a false designation of origin, or any false description or representation . . . and shall cause such goods . . . to enter into commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation." 15 U.S.C. § 1125(a).

■■ While there has been no proof of actual confusion yet, the very reading of the two trademarks makes it obvious that there is a strong likelihood of confusion of origin (at least in commemorative silver plates) and proof of actual confusion is not necessary, see Gold Master Corp. v. Miller, 380 F.2d 128, 129 (2 Cir. 1967) where the products are the same and the class of customers relatively the same. See Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245, 1252 (4 Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 624 (5 Cir. 1963). The plaintiff is not required to prove palming off. Best & Co. v. Miller, *supra.* The question is whether the plaintiff is a person likely to be damaged by the defendant's use of the false description.

Since both parties claim use in interstate commerce and, as evidenced by their common willingness to litigate this matter, are both interested in growth, the clash is almost inevitable, certainly in the field of commemorative silver plates.

The plaintiff has spent large sums in advertising and promotion. It has sold its wares in 46 states. It has already attained a significant volume with a

3. Historical names which are descriptive of the product, however, must prove a secondary meaning. See, *e. g.*, Nancy Ann Storybook Dolls, Inc. v. Dollcraft Co., 197 F.2d 293 (9 Cir. 1952), cert. denied, 344 U.S. 877, 73 S.Ct. 172, 97 L.Ed. 679. In Wyatt Earp Enterprises v. Sackman, Inc., 157 F.Supp. 621 (S.D.N.Y.1958) the name was descriptive of the television program "The Life and Legend of Wyatt Earp" and hence required a secondary meaning.

4. On the other hand, its use of the image of the Washington Monument in its Mint mark tends to show that the goods are made in Washington which is not true.

mark I have found to be an arbitrary mark protectible from its first use. The defendant, on the other hand, limps to the starting line with a mark of doubtful validity. It has, almost literally, remained at the starting line. Its interstate sales of its "Last Supper" plate have amounted to no more than $1,500 and its intrastate sales come to only $625. See Finding of Fact No. 13, *supra*.

If the plaintiff has a reasonable prospect of ultimate success in the action, there are still the questions: (1) how irreparable must the irreparable harm be if interim relief is not granted; and (2) how should the conflicting interest of the defendant be weighed?

■ Even if the trial is only a couple of years away it cannot be said with certainty that the plaintiff, absent a preliminary injunction, could *never* recover from the effects of the alleged unfair competition. But I do not think the test to be so extreme. It is not necessary to anticipate an actual diversion of buyers but only confusion. If time is given to the defendant to move into the same competitive market there would inevitably begin an attrition of the aura of exclusivity appropriated to the plaintiff's good will. It would tend to take the plaintiff's reputation out of its own control. Ambassador East, Inc. v. Orsatti, 257 F.2d 79, 82 (3 Cir. 1958); Franklin Mint, Inc. v. Franklin Mint, Ltd., 331 F.Supp. 827, 830 (E.D.Pa. 1971). It may be enough to cast doubt among prospective purchasers whether there really is only one George Washington Mint that makes silver plates. That kind of invasion might be enough to arrest the progress of the plaintiff in its legitimate building of its mark as meaning a single source. Put another way, it would involve a serious change in the status quo.

On the other hand, a preliminary injunctive decree in a case of this sort is sometimes an act of kindness to the party enjoined. It cuts him off from a business life which, from all the portents, would involve a series of trademark frustrations. By the time he would have attained some modicum of success, it might be taken away by court decree, making him start all over again. It is more consonant with equity to enjoin him at the threshold of his enterprise. See United Merchants & Manufacturers, Inc. v. Amtex Fabrics, Inc., 29 Misc.2d 86, 212 N.Y.S.2d 498, 500 (1961).

■ As a matter of discretion, and keeping the interest of the public in mind, I think a preliminary injunction as to commemorative silver plates is warranted under the Lanham Act except in Ohio where the defendant, under the doctrine of United Drug Co. v. Theodore Rectanus Co., *supra*, seems to have a prior local use.[5]

■ I arrive at the same result with respect to the common law claim. Since the plaintiff's mark is arbitrary and requires no proof of secondary meaning it is entitled to protection against infringement from the beginning of its use.[6] And the likelihood of confusion without evil intent by the defendant would, under New York law, be sufficient to invoke the discretion of a court of equity in its favor. See Avon Periodicals, Inc. v. Ziff-Davis Pub. Co., 27 Misc.2d 160, 113 N.Y.S.2d 737, 742–743 (1952), modified on other grounds, 282 App.Div. 200, 122 N.Y.S.2d 92 (1st Dept.1953).

As to the extent of the relief, however, I find that the plaintiff's mark is not so strong, in the absence of secondary meaning, to require a preliminary injunction against the defendant from using its own mark on silver objects oth-

---

5. The date of the plaintiff's registration or of sale in Ohio does not appear.

6. I think it is too early for "The Geo. Washington Mint" to have achieved a secondary meaning, but it seems to be well on its way through its extensive advertising and promotion.

er than silver plates. The chance of confusion alone would not warrant a preliminary injunction in these circumstances with respect to an adjacent market. See S. C. Johnson & Son v. Johnson, Inc., 175 F.2d 176, 180 (2 Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407, 409 (2 Cir. 1917), cert. denied, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918).

The impact of offering diverse but related wares in the same channels of distribution, see *Aunt Jemima, supra,* can only be found here after a full trial. *Cf.* Esquire, Inc. v. Esquire Slipper Manufacturing Co., 139 F.Supp. 228, 233 (D. Mass.1956), remanded on other grounds, 243 F.2d 540 (1 Cir. 1957).

The plaintiff's present production is of a series of plates by famous named artists. The defendant's primary field is principally coins, medals and ingots. Without foreclosing the ultimate result, I think this limitation, coupled with the defendant's right to its trademark even on commemorative silver plates in Ohio only, is adequate relief for the time being. There is not a sufficient showing that the plaintiff may expand into the related field or that the defendant's activities in the related field would stain its reputation. Triumph Hosiery Mills v. Triumph International Corp., 308 F. 2d 196, 197–198 (2 Cir. 1962). If a final judgment should find the mark "The Washington Mint" to be conclusively deceptive as to origin, or that the sale of related products will tend to confuse or dilute the plaintiff's mark, no irreparable injury will have resulted to the plaintiff from the interim exceptions, which can, of course, be eliminated in a final decree if the plaintiff is wholly successful.

In view of this determination, it is unnecessary to decide the issue on the basis of the New York General Business Law, McKinney's Consol.Laws, c. 20, although, it may be noted, the New York anti-dilution statute affords some further support to the result reached. See N.Y. General Business Law § 368–d (McKinney, 1968).[7]

Finally, there is no merit to the defendant's contention that the plaintiff comes into equity with unclean hands. The owner of a trademark need not be the manufacturer provided he controls the product. And the use of the word "Mint" as applied to minted silver goods seems not uncommon. See Franklin Mint, Inc. v. Franklin Mills, Ltd., *supra.* The other contentions respecting the "unclean hands" doctrine are without merit.

The foregoing shall constitute my conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Settle decree on notice.

7. N.Y. General Business Law, § 368–d reads:
   "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."