PLAYBOY ENTERPRISES,
INC., Plaintiff,

v.

CHUCKLEBERRY PUBLISHING, INC.,
Tattilo Editrice Spa, Publishers Distrib-
uting Corporation, Arcata Publications
Group, Inc., Defendants.

No. 79 Civ. 3525.

United States District Court,
S. D. New York.

Feb. 6, 1980.

416

[redacted]

**418**

Darby & Darby, New York City, for plaintiff; William F. Dudine, Jr., David R. Francescani, George H. Wang, New York City, of counsel.

Kenyon & Kenyon, Goldschmidt, Fredericks, Kurzman & Oshatz, New York City, for defendants Chuckleberry Publishing, Inc. and Publishers' Distributing Corp.; Charles R. Brainard, Martin P. Michael, James Galbraith, Barry I. Fredericks, Lois C. Schlissel, New York City, of counsel.

SOFAER, District Judge:

■ This is an action for alleged trademark infringement and unfair competition arising out of defendants' proposed publica-tion and distribution in the United States of a magazine entitled "PLAYMEN". The plaintiff, Playboy Enterprises, Inc. ("PEI") publishes the well-known male entertainment magazine, "PLAYBOY". The PLAYBOY mark is registered with the United States Patent Office for a variety of uses, including use for a monthly magazine.[1]

Defendants announced their intention in July 1979 to publish in the United States a male entertainment magazine under the trademark PLAYMEN. Defendant Tattilo Editrice SPA, an Italian company, currently publishes an Italian language men's entertainment magazine under that name. Defendant Chuckleberry Publishing, Inc., is a New York corporation, which has been granted the exclusive worldwide rights to publish PLAYMEN magazine in the English language. Publishers Distributing Corporation and Arcata Publications Group, Inc. have been retained by Chuckleberry to distribute and print PLAYMEN.

■ Plaintiff has obtained through discovery and introduced a mock-up of the first issue of the PLAYMEN magazine defendants propose to print and sell. Plaintiff contends that defendants' threatened distribution of this PLAYMEN magazine will infringe plaintiff's property rights in the PLAYBOY mark, and therefore seeks a preliminary injunction pending the outcome of this litigation. Discovery commenced soon after the complaint was filed, on July 6, 1979, and the motion for preliminary injunction was filed on July 23. On August 23, 24 and 25, a hearing was held on the motion, at which several witnesses testified for plaintiff, but none for defendants. Extensive papers were filed by both sides, before and after the hearing. On September 11, 1979, at the request of the parties, and to avoid economic hardship due to uncertainty, the court advised the parties of a

---

1. Plaintiff has alleged causes of action under §§ 32(1) and 43(a) of the Lanham Trademark Act, 15 U.S.C. §§ 1114(1) and 1125(a) respectively, as well as under the New York State Anti-Dilution Statute, General Business Law § 368–d (McKinney's 1968). In view of the finding of likelihood of confusion, it is unnecessary to decide whether defendants' proposed use of the PLAYMEN mark would violate New York's anti-dilution statute, which in any event seems inapplicable to similar, competitive products. *See Ives Laboratories, Inc. v. Darby Drug Co., Inc.*, 455 F.Supp. 939, 951 (E.D.N.Y. 1978), aff'd 601 F.2d 631 (2d Cir. 1979); *see generally* McCarthy, *Trademarks and Unfair Competition*, §§ 24:13, 24:15 (1978).

firm inclination to grant the injunction, but left the parties free to proceed without judicial restraint.[2] At this time, on the basis of the findings and conclusions that follow, the motion for a preliminary injunction is granted.

■ The standard governing motions for preliminary injunctions in this Circuit was recently restated in *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir. 1979):

> A preliminary injunction is proper where the plaintiff establishes possible irreparable harm and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

See *Selchow & Richter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 27 (2d Cir. 1978); *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356, 1359 (2d Cir. 1976); Mulligan, *Preliminary Injunction in the Second Circuit*, 43 Brooklyn L.Rev. 831 (1977). Accordingly, this case will be analyzed with respect to, first, plaintiff's chances of success, which necessarily includes some consideration of whether "serious questions going to the merits are presented", and second, the presence of possible irreparable injury, which necessarily includes some consideration of where the "balance of hardships" tips.

A. *Likelihood of Success on the Merits*

■■ Whether plaintiff is likely to succeed on the merits depends on "the likelihood that the plaintiff's mark is valid, is worthy of protection, and is being [or would be] infringed by the defendant." *W. E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868, 871 (2d Cir. 1966). The PLAYBOY mark has been registered for magazine use for well over five years in compliance with Sections 8 and 15 of the Lanham Act. 15 U.S.C. §§ 1058 & 1065. Its registration constitutes conclusive evidence of trade-

mark validity since defendants have not challenged it on any permissible ground. See 15 U.S.C. § 1115(b); *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

■ Whether, and the extent to which, the PLAYBOY mark is "worthy of protection," and would be infringed by PLAYMEN, depends ultimately on plaintiff's ability to show that defendants' planned use of PLAYMEN would be likely to cause public confusion within the meaning of Sections 32(1) and 43(a) of the Lanham Act. Confusion would occur if consumers were led to mistake PLAYMEN for PLAYBOY, or were led to believe that plaintiff actually produced PLAYMEN or otherwise sponsored or approved the proposed magazine. See *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, supra*, 604 F.2d at 204–05. Confusion may also take the more subtle but no less significant form of an association of the alleged infringer's mark with plaintiff's, through which the new product gains unfair economic advantage. The latter form of confusion is particularly important in this case.

■ In considering whether confusion is likely to result from defendants' proposed use of PLAYMEN, a variety of factors must be considered, including: 1) the strength of plaintiff's mark; 2) the degree of similarity between the two marks; 3) the degree of similarity between the products; 4) the purpose of the defendant in adopting its mark; and 5) evidence of confusion. See, *e. g., Menley & James Laboratories v. Approved Pharmacy Corp.*, 438 F.Supp. 1061 (N.D.N.Y.1977).

1. *Strength of the PLAYBOY Mark*

■ The strength of a mark refers to its distinctiveness, "or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source."

**2.** Defendants proposed after the hearing to modify the title and cover of their magazine. No agreement resulted from these proposals, however, and no ruling has been explicitly sought or given on any of them.

*McGregor-Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir. 1979). This is a pivotal inquiry, the determination of which will establish a mark's validity and the degree of its protection. The inquiry is two-staged. First, the mark is analyzed as a word or phrase in the abstract, without regard to its actual public acceptance. Then, the mark is tested for "its 'origin-indicating' quality, in the eyes of the purchasing public." Id.

 A mark is evaluated for distinctiveness in this Circuit by initially classifying it as (1) generic, and therefore invalid, and not registrable as a trademark; (2) descriptive, and therefore subject to registration only if it has become distinctive of the applicant's goods in commerce—i. e. only if it has acquired secondary meaning; (3) suggestive and (4) arbitrary or fanciful, both of which reflect a sufficient degree of inherent distinctiveness so that the mark is entitled to registration without proof of secondary meaning. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976).

 PLAYBOY is surely not a generic name, *see id.* at 11–12; nor is it "descriptive" when used to designate a magazine.[3] The proper designation of the mark would appear to be "suggestive," in that the word "playboy", evoking the aspirations, if not the life-style, of certain men, suggests to the imagination the nature of the magazine's content. This type of mark is sufficiently strong that it would be "entitled to registration without proof of secondary meaning, as are fully arbitrary or fanciful terms." *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1131.

 As the Second Circuit has explained, although its categories relating to strength are useful for analytical purposes,

strength "depends ultimately on [a mark's] distinctiveness, or its 'origin-indicating' quality in the eyes of the purchasing public," *id.* at 1131, or as District Judge Lasker described it in that case, "from its public history," *id.* at 1132. Thus, even if PLAYBOY were classified as closer to a "descriptive" than to a "suggestive" mark, the ultimate test of its strength is its actual recognition among the consuming public.

 The PLAYBOY mark has acquired great distinctiveness among consumers, and is therefore entitled to a high degree of protection. *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1131–32. PLAYBOY magazine is one of the top eleven magazines in terms of circulation in the United States (about 5.5 million copies per month), enjoying $60,000,000 in annual advertising revenues. During the past fiscal year, plaintiff spent approximately $18,000,000 in promoting PLAYBOY. Gross magazine revenues in the United States and Canada now stand at about $189.3 million per year. In addition, numerous editions of PLAYBOY appear throughout the world, many in the languages of the nations in which they are sold. (PX 17)[4]

Plaintiff's witnesses testified without contravention that PLAYBOY magazine is the crucial component of plaintiff's business empire. The high degree of world-wide public recognition achieved by PLAYBOY has enabled plaintiff to sell numerous other products under the PLAYBOY mark, including books and the Playmate calendar. Sales of these items generate annual revenues in excess of $100 million (PX 34). In addition, manufacturers and retailers of still other products have paid plaintiff for the right to use the PLAYBOY mark; annual retail sales of products sold under the

---

**3.** As Judge Weinfeld explained in *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968):

A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

**4.** Plaintiff's and defendants' exhibits will be designated "PX" and "DX" respectively. References to briefs will be to the parties' post-hearing briefs and will be indicated by "PB" and "DB" respectively. References to the transcript will be indicated by the abbreviation "Tr."; affidavits will be indicated by "Aff."

mark now exceed $82 million, and appear to be increasing. Defendants made no effort to controvert plaintiff's assertion that the mark itself is worth over $200 million.

### 2. *Similarity of the Marks*

Defendants argue that, however strong the PLAYBOY mark may be, the mark PLAYMEN is sufficiently different to negate a finding of likelihood of confusion. They contend, in effect, that plaintiff has no monopoly over the use of the common word "play", and note that several other magazines use that word in their titles, including PLAYGIRL, PLAYBIRDS, PLAYGUY, and PLAYERS.[5] The presence of such magazines, they urge, precludes plaintiff from obtaining protection beyond the actual mark it has adopted.

█ Defendants, correctly contend that where common words of the English language are used as trademarks a slight difference may sometimes be sufficient to avoid confusion. *See Affiliated Hospital Products, Inc. v. Merdel Game Manufacturers Co.*, 513 F.2d 1183 (2d Cir. 1975) (use of trademarks "KICK'ER" and "KIK–IT" allowed, albeit reluctantly, for similar tabletop soccer games); *Beech-Nut, Inc. v. Warner-Lambert, Inc.*, 346 F.Supp. 547 (S.D.N.Y.1972), *aff'd*, 480 F.2d 801 (2d Cir. 1973) ("BREATH PLEASERS" and "BREATH SAVERS" allowed for similar breath mints). These marks were weak however, not because common words were involved but because they were either descriptive of the product or borrowed from the product's generic name.[6] Neither the word "play" nor "boy," nor the combination of those words, describes in its common meaning a magazine. Rather, "playboy" appeals to

the imagination—indeed, perhaps the fantasies—of a certain type of reader.

█ Where common words have been used in a suggestive as opposed to descriptive manner, courts have readily granted them protection from similar marks. *E. g. American Home Products v. Johnson Chemical Co.*, 589 F.2d 103 (2d Cir. 1978) (likelihood of confusion found between "Roach Inn" and "Roach Motel" to warrant a preliminary injunction); *Burger Chef Systems, Inc. v. Burger Man, Inc.*, 492 F.2d 1398 (C.C.P.A.1974) ("Burger Man" found to infringe "Burger Chef"); *Mem Company, Inc. v. Hes Company, Inc.*, 149 U.S.P.Q. 8 (S.D. Cal.1966) ("London Leather" found to infringe "English Leather"); *see also Hancock v. American Steel & Wire Co. of New Jersey*, 203 F.2d 737 (C.C.P.A.1953) ("Tornado" found confusingly similar to "Cyclone"); *S. C. Johnson & Son, Inc. v. Drop Dead Co.*, 210 F.Supp. 816 (S.D.Cal.1962), *affirmed*, 326 F.2d 87 (9th Cir. 1963), *cert. denied*, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 177 (1964) ("Promise" infringed "Pledge"—label imitated); *Masterpiece of Pennsylvania, Inc. v. Consolidated Novelty Co.*, 368 F.Supp. 550 (S.D.N.Y.1973) ("Alpine King" infringed "Mountain King" for artificial Christmas trees). In terms of both appearance and suggestion, PLAYMEN is about as close a mark to PLAYBOY as can be conceived without outright duplication. As Judge Friendly has noted, the Second Circuit "does not look with much favor on the businessman who, out of a wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product." *A. T. Cross Company v. Jona-*

---

5. Defendants' reference to the magazines PLAYSURE (a community publication in North Houston, Texas) and PLAYBILL (a well-known theater publication) adds nothing to the likelihood of confusion analysis. They are utterly different in appearance, content, and distribution from both PLAYBOY and the proposed PLAYMEN magazines. Defendants refer also to a magazine entitled BLUEBOY. The name BLUEBOY seems much less similar to PLAYBOY than PLAYMEN; "blue" boy is different

in appearance and suggestion from "play" boy. Further, BLUEBOY magazine is different from PLAYBOY in appearance, market (male, homosexual), and content.

6. Furthermore, there was no showing in *Affiliated Hospital* or *Beech-Nut*, as there was here, that plaintiffs' marks were economically "strong", with wide public recognition. Even so, the court in *Affiliated Hospital* appeared troubled in finding no infringement.

*than Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir. 1972).

The existence of other sex-oriented magazines utilizing the word "play" raises more substantial questions. The presence of such magazines arguably tends to create an environment in which marks utilizing the word common to all of them are weakened. Consumers could (defendants contend consumers *have*) become accustomed to distinguishing among magazines with similar titles and therefore would be relatively less likely to become confused. But where a demonstrably strong mark such as PLAYBOY is involved, one must not hastily assume such consumer discrimination. The extent to which the PLAYBOY mark has been affected by the presence of other magazines depends upon their similarity in form and content to PLAYBOY, their circulation and market, and all factors relevant in evaluating their potential for inducing consumers to develop an especially keen ability to distinguish among similar titles.

Of the magazines cited by defendants as undermining the PLAYBOY mark, PLAYBIRDS has no significance. PLAYBIRDS is a sex-oriented magazine but its style and content is bush league compared to PLAYBOY. It consists essentially of a series of pictures of unclad women with their legs open, exhibiting with dull redundancy the organ that PLAYBOY strives to make mysterious and interesting through suggestive display. Further, PLAYBIRDS is published in Britain, and no evidence was introduced at the hearing to show it circulates in this country.[7]

The remaining publications are, like PLAYBOY, sex-oriented magazines sold at newsstands. But it seems clear that consumers would, on quick perusal, recognize that each appeals to a readership different from PLAYBOY's market. PLAYERS is designed for Black male audiences; the word "players" has a special connotation in Black parlance. (Tr. 156) Almost all the models used are Black, and all the stories, features and layouts have Black themes. PLAYGUY is a magazine unquestionably aimed at the male homosexual population; it is subtitled: "The magazine for men who like things manly". Its cover, content, and format are entirely different from PLAYBOY's. Instead of the semi-nude woman usually on the PLAYBOY cover, PLAYGUY features a semi-nude male; inside are innumerable pictures of nude or partially nude men, alone or in groups, revealing a homosexually oriented preoccupation with the male sexual organ. The quality of the pictures in PLAYGUY—most of which are black and white—and its distinctive two-toned logotype further serve to distinguish PLAYGUY from plaintiff's magazine. PLAYGIRL magazine also concerns itself with the male body, and features photographs, including a two-page centerfold, of nude and semi-nude men. But its readership target, though heterosexual, is clearly female, rather than male; it is subtitled: "Entertainment for Women." By contrast to all these magazines, PLAYMEN is not only similar in appearance and content to PLAYBOY, it is aimed at the same market: the heterosexual male.

Defendants contend that PEI's failure to institute litigation against PLAYERS and PLAYGUY, as well as its decision to enter into what they term an unfavorable settlement with PLAYGIRL,[8] permits the inference that there is no likelihood of confusion in this case. This argument is unpersuasive. The owner of a mark is not required to police every conceivably related

---

7. Defendants' counsel informed the court in a letter dated January 24, 1980, that the publishers of HUSTLER magazine have announced their intention to distribute PLAYBIRDS in the United States. This development seems inconsequential, even if true, but defendants will be free to explore its significance at the trial on the merits.

8. Shortly after PLAYGIRL magazine was first published in 1973, PEI sued for trademark infringement. *Playboy Enterprises, Inc. v. Playgirl, Inc.,* Case No. 73 Civ. 1140 (N.D.Ill.). In 1974, PEI settled that suit on terms that permitted defendants to use the PLAYGIRL mark.

use—thereby needlessly reducing non-competing commercial activity and encouraging litigation—in order tò protect a definable area of primary importance.[9] Defendants' reliance on the terms of the 1973 PEI-Playgirl settlement is also of dubious propriety and significance.[10] In light of the strength of the PLAYBOY mark, PEI has preserved, at the very least, its right to protection against use of marks with the prefix "play" in areas of direct competition—the areas most crucial to maintaining its mark's commercial value.

In the area of competing uses, PEI has in fact been diligent in defending the PLAYBOY mark. Since PLAYMEN magazine was first published in Italy, PEI has sued in several nations and succeeded in preventing dilution of the mark by PLAYMEN everywhere but in Italy,[11] where a standard inconsistent with our law was applied to deny PLAYBOY any protection.[12] Numerous successful litigations in the United States also attest to plaintiff's efforts in protecting its marks from commercially significant infringements.[13] Finally, and perhaps most

**9.** Numerous cases have held that the existence of infringers other than defendant, against whom the plaintiff has not instituted legal action, is irrelevant in determining whether injunctive relief should issue against the defendant. *E. g. McNeil Laboratories v. American Home Products Corp.,* 416 F.Supp. 804 (D.N.J. 1976); *International Order of Job's Daughters v. Lindeburg & Co.,* 196 U.S.P.Q. 461 (N.D.Cal. 1977); *United States Jaycees v. San Francisco Junior Chamber of Commerce,* 354 F.Supp. 61, 73 (N.D.Cal.1972), *aff'd,* 513 F.2d 1226 (9th Cir. 1977), and cases cited therein; *see also* 4 Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 87.3(e) at 152 (3d Ed. 1970).

**10.** To consider the terms of that settlement in this action would be improper and unjustified. It is well-established that statements made for purposes of settlement negotiations are inadmissible, and Rule 408 of the Federal Rules of Evidence extends the exclusion to completed compromises when offered against the compromiser. *See generally* 2 J. Weinstein & M. Berger, *Weinstein's Evidence,* ¶ 408[04] (1978). The policy underlying that rule—encouraging settlements—applies here. Perhaps this evidence could, as defendants contend, be considered in evaluating the credibility of PEI witnesses, but if so, it only bolsters their credible expressions of present concern. In any event, that plaintiff settled with PLAYGIRL does not in fact establish what a court would have decided had the parties proceeded to trial. A host of factors may affect a litigant's decision to settle. Nor should hindsight be the guide in assessing the wisdom of plaintiff's settlement. Plaintiff might have made a mistake in not pursuing its rights with appropriate zeal against PLAYGIRL, but this does not preclude it from protecting its mark from future confusion with a magazine in direct competition for plaintiff's established market.

**11.** United Kingdom: *HMH Publishing Co. v. Balsamo Publications Ltd.,* High Court of Justice, Chancery Division, Feb. 26, 1969.

France: *HMH Publishing Co. v. Balsamo Editore,* S.p.a., Paris Court of Appeals, No. 4310/69, Jan. 21, 1970.

West Germany: *HMH Publishing Co. v. Balsamo Editore,* County Ct., Frankfort/Main, Sept. 1968.

**12.** The Milan Civil and Criminal Court rejected PLAYMEN's contention that PLAYBOY "was null . . . because it was constituted by a word in common use . . . ." (DX 31, p. 7) It held that the word PLAYBOY had "sufficient requisites of originality to enjoy the dignity of a fully protectable trade mark." *Id.* 15. In effect the court found the mark suggestive, perhaps even original: "the transposition of 'Playboy' from common American language to a distinctive mark for . . . magazines . . . constitutes . . . the use of a new word, having a full and autonomous characterizing function . . . ." *Id.* 16. The intermediate appellate court reversed, ruling that "lexically" Playboy was a weak mark in that it was in common use, and even as used on a magazine it served "to identify the product and in this way to draw the attention of consumers to the peculiar features this has to offer. . . . ." (DX 32, p. 11) Given this weakness, the court held, "even slight dissimilarities can be sufficient to deny" it protection, and PLAYMEN was different enough because it has no specific meaning. *Id.* 12–13. The Supreme Court affirmed on this theory, expressly not reaching the question of PLAYBOY's validity. (DX 33, pp. 8–13) In effect, these appellate courts held that a common word, used suggestively, "lexically" constitutes so weak a mark that it deserved no protection from even a slightly dissimilar mark, irrespective of the user's motivation in adopting the new mark, or of the actual distinctiveness (or origin-indicating quality) of the senior mark in the minds of consumers.

**13.** PEI and its predecessor have diligently enforced their rights in the PLAYBOY and PLAYMATE trademarks in the federal courts as well as in the Patent and Trademark Office.. *See HMH Publishing Co., Inc. v. Brincat,* 342 F.Supp. 1275 (N.D.Cal.1972), *aff'd, in part and*

importantly, PEI has established that the strength of the PLAYBOY mark in the male heterosexual sex-oriented magazine market is in fact great, and defendants have failed to come forward with any concrete evidence to show that it has been measurably diluted or adversely affected by the other non-competing "play" prefixed magazines.

3. *Similarity of the Products*

In trademark cases involving essentially the same product, sold in the same channels of trade, the courts will more readily find infringement than they will where dissimilar, non-competing products are at issue. *See, e. g., American Home Products v. Johnson Chemical Co., supra,* 589 F.2d at 106. As already noted, the magazine PLAYMEN is similar to PLAYBOY in terms of content, format and appearance. The PLAYBOY cover is laid out in a certain style, with the magazine name across the top, the picture of a young woman on the cover, and various articles and features announced in multi-colored leads to the side. PLAYMEN replicates this layout in all material respects. Both magazines feature numerous photographs of nude or provocatively clad women, including the distinctive three-page center-fold long employed by PLAYBOY. PLAYBOY calls its center-fold feature "Playmate of the Month", while PLAYMEN calls its feature "Woman of the Month", but the gimmick is the same. In addition, both attempt to present the image of a magazine that caters to all of a man's interests by includ-

ing interviews with celebrities, short stories, cartoons and features on matters of public importance.

Defendants urge as distinguishing features the fact that PLAYMEN would use, on its first cover at least, a different logotype (rounded script-type letters) from that used by plaintiff (square block letters), as well as a red, green and white stripe "Italian logo" connoting its Italian origin. In addition, defendants note that their names as publishers would be indicated inside the magazine on the indicia page. PLAYBOY, on the other hand, uses a rabbit as its logo, and lists PEI as publisher on its inside cover. But these are minor differences. While differences in logotype may be pertinent to consumer confusion, *see Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350 (9th Cir. 1969), they are by no means conclusive; in the instant case, the logotypes are similar, and could be made more similar in future issues. Nor are the publishers' logos significant distinguishing features: a good part of the Italian-stripe logo is obscured by the PLAYMEN title, and the PLAYBOY rabbit is used on PLAYBOY's cover in a manner designed to make it difficult to find, as part of a monthly game the PLAYBOY reader apparently enjoys. The publisher identity notations are inside the cover, in small type. Finally, these superficial dissimilarities pale when judged in the context of consumer purchasing patterns, discussed below.

Defendants also argue that their pictorials have a "sophisticated," European

---

rev'd in part, 504 F.2d 713 (9th Cir. 1974); *HMH Publishing Co., Inc. v. Turbyfill,* 330 F.Supp. 830 (M.D.Fla.1971); *HMH Publishing Co., Inc. v. Turner,* 222 F.Supp. 145 (N.D.Ga. 1963); *aff'd,* 380 F.2d 224 (5th Cir.), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967); *HMH Publishing Co., Inc. v. Hale,* 156 F.Supp. 594 (N.D.Cal.1957); *John B. Stetson Company v. Playboy Enterprises, Inc.,* 181 U.S.P.Q. 403 (P.O.T.T. & A.B.1973); *HMH Publishing Co., Inc. v. Breglia,* 141 U.S.P.Q. 36 (P.O.T.T. & A.B.1964); *HMH Publishing Co., Inc. v. John Baumgarth Co.,* 129 U.S.P.Q. 327 (P.O.T.T. & A.B.1961). The only court decision involving alleged infringement of the PLAYBOY and PLAYMATE marks in which plaintiff was unsuccessful is *HMH Publishing Co., Inc.*

*v. Lambert,* 482 F.2d 595 (9th Cir. 1973). That case involved the use by defendants of the name Playgirl and Playgirl Club for a particular type of nightclub bar. In a questionable decision, the Ninth Circuit upheld the district court's finding that there was no likelihood of confusion, because there was no physical similarity between the type of nightclub operated by defendant and the type operated by plaintiff's licensee, and because defendants were not found/to have intended to infringe plaintiff's mark. In this case, by contrast, the magazines are extremely similar, and there is a reasonable basis in the record to infer that defendants hope to create confusion in the marketplace by virtue of their similar mark.

flavor not found in PLAYBOY. Indeed, plaintiff maintains that it strives for a "wholesome", All-American image, and abhors the prospect of readers confusing or associating PLAYBOY with PLAYMEN. If "sophisticated" means more explicit, then PLAYMEN certainly is for a grown-up playboy; its stories and pictures are, for example, far freer than PLAYBOY's in depicting copulation and in treating homosexuality. Yet, in light of the many overt similarities between the magazines, it is unlikely that differences between PLAYBOY's "wholesome" indulgence and PLAYMEN's unrestrained license would adequately serve to avoid public confusion.

 Defendants correctly argue that, although the magazines here are very similar to each other, they are also similar to other magazines in the same male heterosexual market. But the other competitive magazines referred to by defendants have highly distinctive marks bearing no resemblance to PLAYBOY. (E. g. HUSTLER, OUI, PENTHOUSE, GALLERY, GENESIS and SWANK). It is the close similarity of the PLAYBOY and PLAYMEN marks in conjunction with the similarities in form and content of the magazines which creates the risk of confusion in this case. Indeed, because the magazines in the male heterosexual market resemble each other, differences among the magazines' names take on special significance as a means of differentiation.

### 4. Defendant's Purpose in Adopting the PLAYMEN Mark

 Where the senior user of a mark can show the junior user adopted a similar mark with the intent of causing confusion

and obtaining unfair commercial advantage, the showing "raises a presumption that deception and confusion resulted." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). The evidence of improper intent is strong in this case, and is certainly an equitable consideration in evaluating defendants' claims.

PLAYMEN's genesis is instructive. A 1971 *Time* article introduced by defendants explains that in 1966 Signora Tattilo and her then husband, Rosario Balsamo, started a magazine called MEN, "a vulgar weekly collection on newsprint of photographs of nude women. . . ." (DX 5) In 1967, they created PLAYMEN which, according to *Time*, "looked enough like PLAYBOY, which was then banned in Italy, to attract buyers." (*Id.*) At the time PLAYMEN commenced publication, foreign language versions of PLAYBOY were selling in several European countries; PLAYBOY sales continued even in Italy despite the ban. (DX 31, p. 13)

Why then did Tattilo and Balsamo name (or rename) their magazine PLAYMEN? Although defendants offered no evidence on this issue, other than Time's pungent appraisal, they persist in suggesting that the name was somehow innocently conceived. Apparently, they would have the court believe that Tattilo and Balsamo dug deep into the Italian lexicon and came up with a word which has no meaning in either Italian or English,[14] but which only by chance resembles PLAYBOY. The proposition is incredible, and not even the Italian courts believed it.[15]

14. Neither, Webster's Third New International Dictionary (1976), nor the Oxford English Dictionary includes any reference to a word "playmen."

15. The trial court in Italy also asked this question, in granting PLAYBOY relief (DX 31, p. 20):

Lastly, the fact that s.p.a. Tattilo Editrice published, prior to Playmen, other magazines, in whose title the word "Men" appeared, is assuredly not one such as to exclude imitation and to make the use of the

title "Playmen" legal, the question if anything arising as to why the defendant should have felt the need, wishing to exploit the "commercial success" of the magazine "Men", although improving its quality, to modify the title, placing the characterizing prefix "Play" before the aforementioned word.

In reversing, the Italian appellate courts ignored the issue, treating PLAYBOY as so inherently weak that intent to benefit from confusion was irrelevant.

Defendants urge that the relevant intent to consider is their purpose in seeking to use the PLAYMEN mark in the United States, not their intent in adopting the mark in 1967. They claim that their present motive is not to trade on PLAYBOY but rather to trade on the international reputation allegedly acquired by PLAYMEN magazine. Only plaintiff's witnesses testified on this issue, and their convincing testimony established that PLAYMEN has no significant international reputation outside Italy.[16] Given PEI's successful suits to keep PLAYMEN off newsstands in England, Germany and France, this is not surprising.

More important, PLAYMEN has no reputation or recognition value in the United States which would explain defendants' present intent in using the mark.[17] The total number of issues of Italian PLAYMEN exported to the United States for newsstand distribution from 1970 to 1977 is 22,891, amounting to an average monthly circulation of 225. (DX–112)[18] Subscription sales of the Italian PLAYMEN during the same period never exceeded seventeen, many of which were bought by PEI personnel. (DX 77, DX 112)

A few short articles have been written about PLAYMEN over the years, but hardly enough to suggest a motive on defendants' part other than to trade on the similarity of PLAYMEN and PLAYBOY. (See DX O, S, Y, BS & BT). Recent publicity regarding the proposed English language version of PLAYMEN in fact appears designed to build up the PLAYMEN mark by repeatedly linking it to PLAYBOY. (PX 42, 43, 44 and 52). Significantly, defendants budgeted more for legal fees ($75,000) than for promotional expenses ($58,000) (DX 120), indicating they were well aware of the risks involved in launching a magazine under the PLAYMEN mark. The economic incentives for adopting a confusingly similar magazine name, discussed below, provide the most likely explanation for defendants' willingness to assume these risks.

### 5. *Proof of Likely Confusion*

Strong evidence that PLAYMEN is likely to cause confusion with PLAYBOY is present simply in the proven strength of the PLAYBOY mark, in the similarity of the marks, and the close competitive proximity of the products. A presumption of confusion is permissible (although unnecessary) from the proof of de-

**16.** Edward Weed, an executive with Hart, Schaffner & Marx, which is marketing a line of men's clothing under the PLAYBOY mark, never heard of PLAYMEN magazine before he saw a recent article in PEOPLE magazine. (PX 38) Smith, PEI's circulation director, whose practice it is to keep current on magazines in the male sophisticate market (Tr. 334), had never heard of PLAYMEN magazine until a few months ago (Tr. 330, 332 and 334). He also testified that other than the recent publicity in connection with this lawsuit, PLAYMEN has no reputation' in this country. Templeton, a Playboy Vice President and Group Director, first heard of PLAYMEN in February 1977, when he was being advised of the competitive market situation in Italy, and heard of it again in the summer of 1977 when he visited the publisher of the Italian edition of PLAYBOY in Italy. From that time on, he did not hear of PLAYMEN magazine until this litigation began. He was unaware of any reputation PLAYMEN had outside of Italy. (Tr. 230–231) Ronald Scott, an independent publisher's consultant, testified for PEI that he had attended, or had participated in at least one convention of every industry association in the publishing field, and

had never heard PLAYMEN mentioned during any of those conventions. (Tr. 472–75).

**17.** Michael Laurence, assistant publisher and business manager of PLAYBOY, testified it has been his practice for over fifteen years to keep current with what is being published in the men's sophisticate magazine field. He reviews approximately 50 titles a month. He did not recall hearing about or seeing any PLAYMEN magazine between the late 1960's and commencement of this action. Nor was he aware of any international fame acquired by PLAYMEN. (Tr. 37–39)

**18.** Defendants' reference to a *Time* Magazine statement that, "[o]n Times Square last week, scarce import copies of *Playmen* were selling for $5 and $6—twice the normal U.S. price," is misleading. As the *Time* article makes clear, PLAYMEN's success in selling out one issue of its infinitesimal U.S. distribution was attributable to the particular issue's contents—nude photos of Jacqueline Kennedy Onassis purchased by PLAYMEN from photographer pirates who had secretly photographed the former First Lady. (DX 4)

fendants' intent in adopting and utilizing the PLAYMEN mark. When placed in proper commercial context, and when considered along with the other evidence of confusion introduced by plaintiff, the likelihood that plaintiff will ultimately succeed seems great.

■ Among the important factors to weigh in predicting confusion are the sophistication of relevant purchasers, normal market conditions, and the attention purchasers give a product before acting:

The relevant cases not only authorize but instruct the trial courts, in making a determination as to likelihood of confusion, to consider the level of sophistication of the relevant purchasers. [Citations omitted.] "The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." Callman § 81.2, at 577 (footnote omitted). As we observed recently in *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731, 733 (2d Cir. 1978), "every product has its own separate threshold for confusion of origin." The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine.

*McGregor-Doniger, Inc. v. Drizzle, Inc., supra*, 599 F.2d at 1137.

PEI witnesses testified without contravention to the commercial context in which male sophisticate magazine sales occur. PLAYBOY sales consist of mail subscriptions (38%) and newsstand purchases (62%). (See 1978 Annual Report on Form 10–K to the Securities and Exchange Commission,

PX 4) The magazine costs $2.50 per issue or $16.00 for a 12-issue subscription, not the size of expenditure that prompts close scrutiny. Michael Laurence testified that in general subscription consumers are relatively unfamiliar with the magazines they purchase, responding in large part to direct mail house solicitations. Thus, because direct mail solicitations are readily available to all advertisers, PLAYMEN would have little difficulty in introducing its name and product to unsuspecting potential purchasers. (Tr. 62–65)

Newsstand sales consist essentially of impulse buying. Ronald Scott, a magazine publishing consultant with extensive knowledge and experience, testified for PLAYBOY that newsstands are typically located in high-traffic areas, and displays are crowded so that often only the left-hand portion of covers are exposed. Covers are designed to attract a consumer's attention. The consumer looks first at the subject on the cover, then to the cover lines, and then, in the case of a sex-oriented magazine, to the center or centerfold if one exists. The decision to buy or not is then made as an emotional response, usually in a matter of seconds. (Tr. 496–98)

Evidence of actual confusion in this case would not have been reasonable to expect, since PLAYMEN has no significant circulation anywhere but in Italy. Nevertheless, some fragmentary evidence of actual confusion was presented. In letters to PEI, consumers who had purchased or received copies of PLAYMEN, linked the Italian magazine with *PLAYBOY*.[19] A revealing comment is also found in PLAYMEN's dummy issue, where in a letter to the editor a consumer writes: "PLAYMEN? I thought it was a typographical error when I saw the name mentioned in the newspaper . . ." (DX 10, p. 12) Although defendants claim that PLAYBOY and PLAYMEN have been

19. One letter is from a United States consumer who purchased a copy of the December issue of PLAYMEN in Italy and supposed it to be the Italian version of PLAYBOY. (PX 61A) A second letter is PX 61B, from a consumer in the United States who, upon receiving Italian PLAYMEN, wondered whether the magazine

had any association with PLAYBOY. Another letter comes from a French consumer who indicated that friends were purchasing the French version of PLAYMEN (when it was being published), thinking it was the French edition of PLAYBOY. (PX 61C)·

competing head-to-head in Italy for several years without actual confusion, they introduced no evidence and had no witness testify on this point. On this record, defendants' unsupported assertion, which permits no inquiry or rebuttal, is entitled to no weight.

 Given the commercial environment in which consumers would confront PLAYBOY and PLAYMEN, at least three forms of confusion seem likely. First, some consumers would almost certainly mistake PLAYMEN for PLAYBOY, either in checking off subscription mailings or in picking up the magazine at newsstands. Because the PLAYMEN cover, centerfold pictorials and articles could generally conform to PLAYBOY's, because the consumer's decision is often ill-informed or impulsive, and because the product's price is unlikely to trigger cautious buying decisions, PLAYBOY's expert witnesses believed that this form of "mistake" would be inevitable. (Tr. 62–63; 508)

A second type of confusion likely to be caused between PLAYMEN and PLAYBOY is confusion as to source. *See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra,* 604 F.2d at 204–05. PLAYMEN's similarities to PLAYBOY are likely to cause even a knowledgeable consumer, who could tell the magazines apart, to think PLAYMEN was published by, or somehow associated with, PEI. Thus, as Laurence testified, the average "buyer would think that PLAYBOY has now come out with a magazine for middle-aged men." (Tr. 193). PEI's experience with PLAYGIRL is particularly instructive. Affidavits of PEI subscription department employees, and copies of letters actually received, demonstrate that consumers have concluded and continue to believe that PEI publishes or sponsors PLAYGIRL. (PX 9A, 9B & 18). Just as consumers reasonably assumed that plaintiff had extended its readership market to include women, they are likely to

believe that PLAYMEN was a new PEI magazine for a slightly older, less "wholesome" audience. That PLAYMEN would compete directly with PLAYBOY does not make this form of confusion less likely. As Smith testified, other similarly named magazines in direct competition with each other are published by the same publisher.[20] Furthermore, while the magazines are very similar in appearance and form, they are sufficiently different in content to justify a reasonable consumer in treating them as complementary, though overlapping. See *infra.*

There is a third, and perhaps most significant, kind of confusion which is likely to work to plaintiff's detriment—that is, defendants' ability to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well-known name. Whereas the average consumer might be less motivated to pick up PLAYMEN if it were named, for example, ADONIS, he is more likely to take notice of PLAYMEN on the newsstand because of an association, if not outright confusion, with the PLAYBOY mark. The significance of subliminal trademark association was recognized by then District Judge Gurfein in *Londontown Manufacturing Co. v. Cable Raincoat Co.,* 371 F.Supp. 1114, 1118 (S.D.N.Y.1974), a case in which the court granted an injunction against the use of the mark SMOG for raincoats on the basis of the LONDON FOG mark:

> If consumers come to think of a wire fence as a reminder of a *cyclone,* then a competitor may not remind them of his wire fence as a *tornado. Hancock v. American Steel & Wire Co., supra.* The reason is that advertising and trademarks rely on impressions. The consumer does not memorize the mark. He has a feeling about it from past exposure. That feeling may be vague, subliminal it is said, but it comes to consciousness when the article is seen with the trademark affixed.

---

**20.** For example, the magazines entitled TRUE STORY, TRUE LOVE, TRUE EXPERIENCE and TRUE ROMANCE are all published by McFadden's. (Tr. 351) In fact, PEI publishes another "male sophisticate" magazine entitled OUI, which is aimed at a younger male readership. (Tr. 160)

Likelihood of subliminal association may be inferred from defendants' apparent intent in using the PLAYMEN mark: to capitalize on the special attention a new magazine would obtain because its name, having no other meaning, conjures up the PLAYBOY name and all it represents.[21] The expert testimony of Scott also provides strong support for this finding. Scott, whose experience includes assisting in launching about 100 magazines, estimated that defendants would have needed about $2,000,000 to start up a magazine that could compete meaningfully with PLAYBOY. (Tr. 528) But the name PLAYMEN, he said, could enable defendants to put their magazine into effective competition with PLAYBOY on a budget of about $50,000. Distributors and others in the channel of distribution of male sophisticate magazines are willing to make room for a new "book" only when they expect it to sell in sufficient quantity to justify displacing some other "book" from among the limited number they can handle. Scott felt professionals in the distribution chain were willing to handle PLAYMEN, despite its modest promotional budget, in large part because they expect consumers to associate the magazine with PLAYBOY, thereby giving PLAYMEN far more attention than it would receive under a dissimilar mark. (Tr. 500)

B. *Irreparable Harm*

■■■■ To obtain a preliminary injunction a moving party likely to succeed on the merits must also demonstrate "possible irreparable harm". *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra.* Because of the trademark's unique function in representing intangible assets such as reputation and good will, however, and the consequent difficulties in measuring its value, irreparable injury will almost always be found when there is a high probability of confusion, as established in this case. *See Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971); *see generally* McCarthy, *Trademarks and Unfair Competition,* § 30:18 (1973). As Judge Gurfein indicated in *George Washington Mint, Inc. v. Washington Mint, Inc.,* 349 F.Supp. 255 (S.D.N.Y. 1972), to obtain preliminary relief in a trademark infringement action, it is unnecessary to show an actual diversion of customers or that plaintiff could never recover from the effects of the infringement. One need only show a danger of confusion, for "[if] time is given to the defendant to move into the same competitive market there would inevitably begin an attrition of the aura of exclusivity appropriated to the plaintiff's good will. It would tend to take the plaintiff's reputation out of its own control." *Id.* at 263.

■■■■ Rather than rely on an inference of irreparable harm, plaintiff presented ample evidence demonstrating the manner in which it would suffer economic harm from the publication, distribution, and sale of defendants' proposed magazine. Plaintiff has shown that the PLAYBOY trademark is its most valuable corporate asset. The mark is not only instrumental·in marketing PEI's magazine, it is the basis of a highly profitable licensing program. The evidence disclosed that the confusion between PLAYBOY and PLAYMEN which is likely to occur would probably have a substantial impact on both of these activities. And, due to the many economic variables involved, the probable injuries would not readily be translated into money damages, making reliance upon legal remedies inadequate. As Judge Friendly said in *Omega Importing Corp. v. Petri-Kine Camera Co., supra,* 451 F.2d at 1195:

---

21. Defendants proposed after the hearing "just to·reassure PEI that defendants are not attempting to take advantage of PLAYBOY's goodwill," to make certain minor changes on the cover and masthead of PLAYMEN, and "to spend $5,000 to buy advertising in PLAYBOY magazine to announce the coming of PLAYMEN and to make clear the fact that it is not associated with PEI." (DB 14–15) This proposal is not worth mentioning as potentially ameliorating evidence; any such advertisement would only increase the likelihood that PLAYMEN would benefit from association with PLAYBOY's name. But the suggestion does reflect defendants' willingness to make light of plaintiff's concerns.

Where there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult . . . . . Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting, but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Accord A. T. Cross Co. v. Jonathan Bradley Pens Co., supra,* 470 F.2d at 690–92; *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.,* 462 F.2d 134 (2d Cir. 1972); McCarthy, *Trademarks and Unfair Competition,* § 30:18.

The market for sex-oriented magazines is extremely competitive, with overall sales recently diminishing. (Tr. 31) Consequently, if PLAYMEN sales increase through improper confusion or association, PLAYBOY's distribution and sales seem likely to suffer. Moreover, as Scott explained, the channels of magazine distribution are profit oriented organizations, presented with a wide variety of products. Where a new magazine bears a name that touches on the name of a highly successful magazine, the possibility of confusion is an inducement to distributors to increase their commitment to the new magazine because they anticipate higher profits (Tr. 500). Scott expected that, because of the similarity of PLAYMEN and PLAYBOY, distributors would move more PLAYMEN copies through the system, allocate PLAYMEN to more retail accounts, and create more display positions for PLAYMEN, all of which would tend to exacerbate PLAYBOY's loss of newsstand circulation due to confusion. (Tr. 501)

A decrease in magazine sales would adversely affect PLAYBOY in several ways. Magazines are sold to distributors on a consignment basis. PEI would therefore not only forego expected profits but would also have to absorb the full cost of a "non-sale." (Tr. 487) In addition to bearing the normal costs of producing and shipping the unsold magazine, PEI would be required to compensate advertisers if magazine sales fell below a certain, agreed-upon number. (Tr. 488–89) Finally, a substantial loss of circulation would adversely affect PLAYBOY's advertising base rate (Tr. 501–02), thereby reducing its advertising revenues.

Defendants seem to agree—indeed, they undoubtedly hope—that plaintiff will lose sales to PLAYMEN. They contend that plaintiff, like every business, runs that risk in a competitive market, and should not be able to prevent a newcomer like PLAYMEN from competing.

The competitive ethic has great appeal. But to attribute PEI's position to anticompetitive motives only obfuscates the real issue: Does defendants' proposed use of PLAYMEN constitute *unfair* competition? Plaintiff claims no vested right in its current level of sales or profits. Its position rests squarely on the lawfully authorized objective of protecting valuable property rights in the well-known PLAYBOY mark. Conceivably, PLAYMEN's alleged "European flavor" would lure customers away from PLAYBOY regardless of its name. If the names remain confusingly similar, however, it is far more likely that PLAYMEN will gain a foothold in plaintiff's market by virtue of confusion rather than any difference in quality or content. Furthermore, if Laurence's attitude accurately reflects plaintiff's intentions, it seems PEI has no real fear of the magazine defendants wish to publish, only of its planned name. (Tr. 158) On the other hand, if defendants are as confident of the quality of their product as they contend they will be hard-pressed to explain why they persist in seeking the unfair advantages of associational confusion from the PLAYMEN name. That they managed to secure use of the name in their

home country while PLAYBOY was banned, under a different legal standard, provides no reason to accord them a similar advantage here.

Plaintiff's witnesses also demonstrated that PEI's valuable and expanding licensing program would probably be injured if defendants are not now enjoined. This program involves essentially the purchase by manufacturers of the right to use the PLAYBOY mark for a variety of products. To the extent the mark would be diluted by the entry of a magazine named PLAYMEN, which in turn could be licensed to competitors of PLAYBOY's licensees, the value of the mark for licensing purposes would be diminished.

A concrete example of this danger was presented through the testimony of Edward Weed, who recently negotiated a major licensing agreement with PLAYBOY on behalf of his company, Hart, Schaffner & Marx ("HS&M"). Under the arrangement, HS&M is in the process of preparing a line of men's suits and clothing bearing the PLAYBOY mark, to be sold at hundreds of stores throughout the nation. Preliminary indications are that the line will be extremely successful. Weed testified, however, that great anxiety had been aroused at his company and among its buyers by the recent articles about PLAYMEN in PEOPLE magazine. (PX 38) He was apprehensive that the similarity of the names would cause confusion, which would dilute the value to HS&M of the PLAYBOY mark.[22] Had his company known that PLAYMEN was on the horizon, he believed it possible that HS&M would not have proceeded with the licensing agreement, because of the confusion danger. (Tr. 273–77) Similar fears would likely lead other potential licensees to shy away from licensing arrangements with plaintiff; it is unnecessary at this stage of the litigation for plaintiff to identify such potential licensees to establish a possibility of irreparable harm.

Confusion as to source often causes irreparable damage because the infringing use involves a product inferior to that established by the senior user. Plaintiff here claims that PLAYBOY's reputation is threatened by consumer confusion as to the source of PLAYMEN, because of the differences in sexual explicitness and taste.

A discernible difference in explicitness and tone unquestionably exists. The lines drawn may seem peculiar to the uninitiated, but they appear significant in the trade. PLAYBOY has opted for what its witnesses call a "wholesome" image. As evidence of its "wholesomeness," PEI points to its success in establishing the largest subscription base of any magazine in the "male sophisticate" market, reflecting a much greater acceptability in the home than such magazines normally enjoy. To achieve a wholesome image, in plaintiff's view, it is necessary to avoid offending a maximum number of consumers and at the same time remain interesting and sexy enough to hold the hard-core of its readership. Two limitations it regards as especially important: avoiding the depiction of homosexual acts and heterosexual copulation.

Defendants question the existence of material differences between the sexual explicitness of PLAYBOY and PLAYMEN. They identified instances in which PLAYBOY has depicted homosexual themes, and they have demonstrated that pubic hair and female genitals appear in PLAYBOY with regularity. Moreover, defendants suggest, PLAYBOY's reputation is unlikely to suffer any harm due to confusion with PLAYMEN, since PLAYBOY has already attracted obscenity prosecutions in some communities, and because such prosecutions are as likely to enhance as to reduce sales.

Plaintiff's response to these contentions is sufficient at this stage in the proceedings to warrant an injunction. However unacceptable and shocking PLAYBOY may be to some consumers, PLAYMEN seems likely

---

22. Weed testified that the value of the PLAYBOY mark to the HS&M marketing program is between $3 million and $5 million. That estimate, he explained, reflects what HS&M would have had to spend in promoting its line of clothing under a new trademark rather than the well-known PLAYBOY mark. (Tr. 261–62)

to repel and shock many more. The proposed first issue of PLAYMEN contains many photographs that strongly suggest or clearly depict lesbian acts, heterosexual copulation, and masturbation.

PLAYBOY does not altogether eschew lesbian themes or copulation. But, unlike PLAYMEN, it does not place primary, or even substantial, emphasis on those subjects in its efforts to stir the male libido. Moreover, PLAYMEN's treatment of those subjects appeals to the more prurient—some might call it kinkier—imagination.[23]

 Defendants correctly note that PLAYBOY has been racier in the past than it is now. But in determining plaintiff's possible harm, the crucial question is not how different the magazines may be but whether there is a danger that plaintiff may lose control of its reputation as a result of confusion. *See George Washington Mint, supra,* 349 F.Supp. at 263. *Accord Chips 'n Twigs, Inc. v. Chip-Chip, Ltd.,* 414 F.Supp. 1003 (E.D.Pa.1974). Control of reputation is not a moral issue, it is a protected commercial prerogative. When PEI perceived its self interest as requiring more sexually explicit treatments in order to compete with PENTHOUSE or other magazines, it engaged in what Laurence now aptly calls the "Pubic Wars." Its current, more straight-laced attitude stems only from its decision to surrender one segment of possible readership in order to compete more effectively for another. (It seeks to compete for the racier crowd with its distinctively named magazine OUI.) It is more concerned now with how American housewives and Japanese businessmen perceive PLAYBOY, so as to protect and expand its licensing operations, than with holding on to or acquiring readers who prefer highly explicit portrayals of potentially controversial subjects. These circumstances may change, and PEI seems likely to reevaluate its policies again, if necessary, to maximize its profits; as Laurence acknowledged, "today's smut might be tomorrow's acceptable 'social grace' . . . ." (Tr. 119) But a purveyor's capacity to control its reputation, in order to maximize its perceived economic interests, is precisely what the law protects.

### C. The Balance of Hardships

The evidence shows not only that irreparable harm is possible but also that the balance of hardships tips decidedly in plaintiff's favor. Thus, even if a likelihood of success had not been shown, preliminary relief would be proper under the second prong of the *Dallas Cowboys* test, since the case raises "sufficiently serious questions going to the merits to make them fair ground for litigation."

 Defendants contend they will sustain significant hardships if enjoined from publishing PLAYMEN at this time. They claim to have invested time, money, talent, and their reputations in a carefully orchestrated campaign designed to culminate in the launch of PLAYMEN. Curiously, though, they offered absolutely no testimony or competent evidence during the three day evidentiary hearing to prove these claims. Argument, however able and ingenious, is no substitute for proof. The moving party must establish the propriety of preliminary relief. *See generally* Wright & Miller, *Federal Practice and Procedure:*

---

**23.** The proposed first issue of PLAYMEN contains several photographs that strongly suggest or clearly depict homosexual acts and heterosexual copulation. "Ritual on the Beach," for example, consists of a series of photographs of two women engaged in sexual play. In another photographic series, "Elisabeth," a single woman plays with herself. More subtle, but nonetheless beyond PLAYBOY's range, is the series "Do it with Shoes," in which the lower halves of several women are shown under tables, with elegantly accoutered feet pointing titillatingly toward each others' exposed vaginas, their hands in suggestive positions. "Warhol/Von Gloeden" is a series of photographs purportedly taken by a nineteenth century Baron whose "favorite models were young men and teenage boys, photographed nude against exotic backgrounds . . .," (DX A, p. 66), with accompanying comments by Warhol. Here, too, the treatment is not particularly shocking, but apparently out of PLAYBOY's line. Finally, the seven-page "photographic essay" entitled "The Gentle Games of Jeanne & Marta" depicts two women kissing and fondling each other.

*Civil* § 2948. Once plaintiff introduced sufficient evidence of irreparable harm, however, defendants were obliged to produce evidence other than affidavits respecting the economic effects of an injunction, particularly since such information is exclusively within their possession.

■ Proof of factual issues on a motion for preliminary injunction on the basis of affidavit testimony is generally disfavored. In *Murray v. Kunzig*, 149 U.S.App.D.C. 256, 264, 462 F.2d 871, 879 (D.C.Cir. 1972), *rev'd on other grounds*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), the court held that the trial judge acted properly in insisting on oral testimony and in refusing to accept affidavits proffered by a defendant in opposition to a motion for preliminary injunction:

> The far better procedure when motions are more than routine is to take oral testimony as to disputed matters of fact. This is because of the better opportunity that oral testimony gives the trier of fact to determine credibility. Affidavits deprive him of the opportunity to judge demeanor, and the opportunity to observe "the chastening process of cross-examination." "Without these twin tools, normal in the trial of factual issues, the factual conclusion [is] certain to take on an unaccustomed quality of artificiality." [footnotes omitted]

■ Oral testimony from defendants was similarly warranted (and invited) in this case. (Tr. 209, 400, 705–06) Walter Zacharius, President of defendant Chuckleberry Publishing, was present in the courtroom throughout the entire hearing, but did not testify, even though his testimony would have been relevant to the balancing of hardships issue. Instead, he chose to file a post-hearing affidavit, much of the contents of which plaintiff vigorously challenges.[24] A party's failure to call a witness under its control, who could testify to material facts, permits an adverse inference, particularly where the testimony would, as here, be important and would ordinarily be expected to favor that party. *Dow Chemical Co. (U.K.) v. S. S. Giovannella D'Amico*, 297 F.Supp. 699, 701 (S.D.N.Y.1969), and authorities cited therein.

Yet, even assuming the validity of defendants' evidence, their investment in PLAYMEN appears relatively small. As Laurence testified, the March 1, 1979 licensing agreement between defendants Tattilo and Chuckleberry provides for no upfront financial commitment. Defendants appear also to have minimized their costs by using in the English version of PLAYMEN editorial and photographic material published in or prepared for Italian PLAYMEN, as well as relatively inexpensive second serial publications. (Tr. 198–200) Furthermore, it appears that defendants' actual advertising and promotional expenditures in launching their proposed product have been relatively modest. Mr. Scott's expert, persuasive and unchallenged evaluation of the available evidence was that defendants have at most engaged in an "active but modest" promotional campaign costing under $50,000 (Tr. 575), and that that sum is quite small compared to what a publisher is normally expected to spend in launching a new magazine such as PLAYMEN. (Tr. 528; PB 80–81)

Furthermore, defendants' investment will not be entirely lost if a preliminary injunction is entered. As Scott testified, although a delay in publication may cause some loss of momentum in marketing a new magazine, the economic consequences to the national distributor would be modest. (Tr. 543–44)[25] Similarly, a publisher's burden would be minimal during such a delay,

---

**24.** The Zacharius affidavit sets forth the alleged hardships defendants would sustain if now enjoined from proceeding with the PLAYMEN mark or a variation of that mark. Scott's testimony at the hearing, as well as his post-hearing affidavit responding to the Zacharius affidavit, gives ample reason to question the possibility of significant hardship.

**25.** The agreement between Chuckleberry and Publishers Distributing Corp. has a liquidated damage provision not to exceed $1,500 per issue unless timely written notice of an omitted issue is given to the distributor. (PX 25) Clearly such notice could have been given in this case.

amounting principally to the cost of maintaining a staff and paying salaries and rents. Chuckleberry has by no means established it will incur even these expenses, since it appears to be a corporate shell set up solely for the purpose of publishing PLAYMEN. Regarding printers, Scott testified that they usually impose no penalty for delay in publication (Tr. 545), and since defendants have not introduced their printing contract into evidence, it is proper to assume that defendants will suffer no penalty. If defendants have purchased paper, it seems they could resell it now at a profit, given the present paper shortage. (Tr. 545) With regard to possible advertising agreements, there is no evidence that defendants have received any payments that would have to be refunded, or if they have, that they could be liable for any delay in publication. In light of the ample evidence in the record attesting to defendants' expectation of litigation with PLAYBOY, they probably have provided for such a contingency.

Of course, defendants could mitigate any losses they may suffer by publishing under a non-confusing trademark. They argue that the costs of changing the title would be unduly burdensome, but not convincingly. The cost of resetting type would probably not exceed $1,000, and only the upper portion of the cover would have to be redesigned. (Aff. of Ronald Scott) PLAYMEN would no doubt have to run new advertising to alert the industry of its name change, as well as send out new advertising rate cards to prospective advertisers. But expenses incurred by defendants in trade journal advertising would presumably be of the same order as its earlier expenditures, or little more than $1,400. (Tr. 571) The cost of preparing and mailing a modified rate card would probably not be greater than $2,000. (Aff. of Ronald Scott)

Defendants most significant cost if enjoined or forced to publish under a new name would result from their need to promote their magazine a second time. They urge that a widespread notification of title change would necessarily cause a loss of credibility and a loss of confidence in the new magazine on the part of retail accounts, wholesalers, advertisers and the industry in general. Advertisers may be disappointed because, as Scott testified, they, too, expected that confusion in the marketplace would facilitate PLAYMEN sales. But defendants have known all along that any credibility they might succeed in establishing in the industry, rapidly and with minimal cost, might well be challenged—and challenged successfully—as the fruits of illegal and unfair confusion.

■ The hardships plaintiff is likely to suffer if a preliminary injunction is denied are far more substantial and less deserved than those defendants may bear if an injunction is granted. The evidence demonstrates a likelihood of confusion, with consequences that include possible loss of newsstand sales, loss of subscriptions, loss of licensing arrangements, and loss of control over reputation. While PEI has no right to be protected from effective competition that would cause some of these same losses, it is entitled to be protected from unfair efforts to steal by confusion in any of its forms the fruits of years of commercial effort. PEI is a large and growing commercial empire, built on the ingenious exploitation of consumer taste and erected on a rather vulnerable foundation, the PLAYBOY mark. Damage to that mark, even during a relatively short period prior to trial on the merits, would likely have grave and perhaps enduring consequences.

■ Defendants' contention that plaintiff is not entitled to equitable relief because of laches is meritless. Plaintiff has been diligent in pursuing its rights against the use of the PLAYMEN mark in Europe. The single suit it lost against PLAYMEN in Italy has no authority here, and is not worthy of deference, particularly in light of the other European decisions. See note 11, *supra*. Nor has plaintiff been dilatory in instituting this action; suit was filed only two months after defendants announced publication of the English-language PLAYMEN, and only days after PLAYMEN's first advertisements appeared. (PB Exh.

A) Parties should not be encouraged to sue before a practical need to do so has been clearly demonstrated.

The cases cited by defendants involved far longer delays and greater prejudice. In *Le Cordon Bleu, S.a.r.l. v. BPC Publishing Co.*, 327 F.Supp. 267 (S.D.N.Y.1971), the court found, *inter alia*, that a delay of thirteen weeks precluded preliminary relief where the delay caused defendant to print and distribute eleven issues of the allegedly infringing magazine. Similarly, in *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.*, 335 F.Supp. 278 (S.D.N.Y.1979), the court denied preliminary relief where the plaintiff had delayed seven and a half months after defendants commenced publishing the allegedly infringing textile design, negating plaintiff's claim of urgent need for speedy action. Here, by contrast, plaintiff has acted soon enough to prevent defendants from commencing publication. Since defendants are still newcomers, who have not yet entered the market with their magazine, the equities tip further in favor of granting preliminary relief. *See Omega Importing, supra,* 451 F.2d at 1195; *George Washington Mint, supra,* 349 F.Supp. at 263.

■■■■■■ Defendants also claim plaintiff should be denied relief because of "unclean hands." Certainly the "unclean hands" doctrine is an appropriate factor in determining whether a preliminary injunction should issue. *Clairol, Inc. v. Gillette Co.*, 270 F.Supp. 371 (S.D.N.Y.1967), *aff'd.* 389 F.2d 264 (2d Cir. 1968). But it is a limited device, invoked by a court only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent defendant's tortious conduct. *See Restatement (Second) of Torts* § 940, Comments b and c. PEI's dealings with the Customs Service seem relatively unobjectionable, hardly egregious enough to permit defendants to proceed with their magazine and thus risk public confusion.[26] To the extent PEI's conduct was questionable, moreover, it is only one factor to consider in deciding whether to grant an injunction. *See generally* Wright & Miller, *Federal Practice and Procedure: Civil* § 2946. Plaintiff's alleged conduct had no material impact upon this case or, for that matter, defendants' present effort to publish PLAYMEN.[27]

Plaintiff should prepare within five days an injunctive order consistent with this opinion. Defendants will have five additional days to object to the scope and form of the proposed order.

SO ORDERED.

---

**26.** Defendants' Post-Hearing Brief, pp. 37–43, recites the bases for their claim of improper conduct. First, they criticize plaintiff for sending a letter to Dino DeLaurentis stating that a predecessor to the present PLAYMEN, entitled INTERNATIONAL PLAYMEN, had been barred by Customs, "thus implying that PLAYMEN itself could not be imported." *Id.* 40. While INTERNATIONAL PLAYMEN had not been ordered barred, Customs had issued a circular ordering importation of the magazine to be reported by agents, and copies sent to the Bureau for disposition. Under these circumstances, PEI was fair in suggesting that PLAYMEN would be banned, which in fact subsequently occurred. That PEI warned defendants' original printer that it would sue is hardly unfair, irrespective of the fact that Customs originally thought PLAYMEN appeared not to infringe the PLAYBOY mark. Nor was it plaintiff's responsibility to bring to Customs' attention in 1976 that Customs had preliminarily opined that PLAYMEN did not infringe PLAYBOY in 1970, or of the disposition of various suits concerning PLAYGIRL. These issues could have been argued to Customs, but on this matter as well defendants have failed to go forward with their own proof.

**27.** As the Chuckleberry-Tattilo licensing agreement acknowledges (PX 24), defendants could have sought to modify the 1977 Customs order banning PLAYMEN from the United States. *See* 19 U.S.C. § 1514. Having failed to do so, defendants may not now rely on vague allegations of harm resulting from the Customs exclusion order.